
Redacted

## AFFIDAVIT OF TASK FORCE OFFICER JAMES PICARDI

I, James Picardi, being duly sworn, hereby depose and state as follows:

1.      I have been employed as a Revere Police Officer since 1991 and have held the rank of Sergeant since 1996. Since September of 2002, I have been assigned as a Task Force Officer ("TFO") of the United States Drug Enforcement Administration ("DEA"). I am currently assigned to the Boston Office of the New England Field Division. As a deputized TFO, I am also a "federal law enforcement officer" within the meaning of Federal Rule of Criminal Procedure 41(a)(2)(C), that is, a government agent engaged in enforcing the criminal laws and duly authorized by the Attorney General to request a search warrant.

2.      During my time as a Police Officer and Task Force Officer, I have participated in numerous investigations and arrests involving infractions of state laws, including Massachusetts General Laws, Chapter 94C, and federal laws, including Title 21, United States Code, Sections 841(a)(1) and 846. Some of the investigations and arrests were in cooperation with the Bureau of Alcohol, Tobacco, Firearms, and Explosives ("ATF"); the Federal Bureau of Investigation ("FBI"); Massachusetts State Police; local police agencies; and DEA Task Force II.

3.      During my law enforcement career, I have received specialized training regarding the activities of narcotics traffickers, including the methods used to package, store, and distribute narcotics, and the methods used by narcotics traffickers to conceal and launder the proceeds of their narcotics-trafficking activities. In addition to my training with the Massachusetts Criminal Training Council Recruit Academy and yearly in-service training, I have participated in courses aimed at educating police investigators in drug interdiction, detection, and recognition, as well as case presentation. I have participated in an accredited 80-hour narcotics investigation course sponsored and taught by DEA. During my training and through my experience, I have observed

marijuana, cocaine, heroin, and other narcotics. I am aware of the prices commonly charged on the street for these substances, the methods of packaging them, and the jargon used in their distribution. I have received training in field-testing controlled substances. I have participated in nearly all aspects of narcotics-trafficking investigations at the state and federal levels, including but not limited to, the arrests of narcotics offenders after lengthy investigations that involved investigative techniques such as undercover purchases of narcotics by police officers and/or federal agents and controlled purchases of narcotics by other sources. I have been involved in multiple Title III electronic-surveillance investigations during my tenure at DEA. I have debriefed numerous defendants, informants, and witnesses who had personal knowledge about narcotics-trafficking activities and the operation of narcotics-trafficking organizations. I have sworn out numerous affidavits in support of search warrants, arrest warrants, and other court applications.

4.      Based on my training and experience, I am aware that drug traffickers commonly use cellular telephones in furtherance of their drug-trafficking activities and frequently "drop" or change cellular telephone numbers and cellular telephones in an effort to thwart law enforcement's use of electronic surveillance. I am familiar with the manner in which narcotics traffickers use telephones; coded, veiled, or slang-filled telephone conversations; electronic text messages; and other means to facilitate their illegal activities. I am familiar with the "street" language used by drug traffickers, as well as the methods they use to disguise conversations and operations.

5.      I am familiar with the manner in which narcotics traffickers use vehicles, common carriers, mail and private delivery services, and a variety of other means to transport and distribute narcotics and the proceeds of narcotics trafficking. I am also aware, from my

2

training an experience, that drug traffickers often install and use electronically operated hidden compartments in motor vehicles to transport large quantities of drugs and drug proceeds. As described more fully below, I am aware that in addition to using their residences, drug traffickers use "stash locations" for their drugs, drug-proceeds, and other items used in furtherance of narcotics-trafficking activities. My knowledge and experience regarding such practices and the types of evidence of drug trafficking typically found during executions of search warrants at the residences and stash locations of drug traffickers is set forth in greater detail in Section VII of the Affidavit below.

6.      My awareness of these drug-trafficking practices, as well as my knowledge of drug use and distribution techniques as set forth in this Affidavit, arise from the following: (a) my own involvement in prior drug investigations and searches during my career as a law enforcement officer; (b) my involvement on a number of occasions in debriefing confidential informants and cooperating individuals in prior drug investigations, as well as what other agents and police officers have advised me when relating the substance of their similar debriefings and the results of their own drug investigations; (c) from this particular investigation and other investigations involving the interception of wire communications pursuant to court authorized Title III wiretaps.

## PURPOSE OF AFFIDAVIT

7.      This affidavit is being submitted in support of a criminal complaint against the following individuals:

> a. **Jovhan SALDANA**, a.k.a. "Cesar," a.k.a. "Santo Valerio FRANCO GUZMAN" (hereinafter, "SALDANA");

3

b. **Andres RAMIREZ-RODRIGUE**, a.k.a. "Primo," a.k.a. "Vija," a.k.a. "Bija," a.k.a. "Alfredo" (hereinafter, "RAMIREZ-RODRIGUE");[1]

c. **Carlos FRANCO**, a.k.a. "El Tío," a.k.a. "Ruby" (hereinafter, "FRANCO");

d. **Eliot CUADRADO-ALMODOVA**, a.k.a. Abdiel VARELA, a.k.a. "Gordo," a.k.a. "Willy" (hereinafter, "CUADRADO-ALMODOVA");

e. **Fernando MARTINEZ-TIBURCIO**, a.k.a. "Chifuco" (hereinafter, "MARTINEZ-TIBURCIO");

f. **Teodoro LOPEZ-SANTOS,** a.k.a. "Willy," a.k.a. "William" (hereinafter, "LOPEZ-SANTOS");

g. **Rafael ROMERO MONTANEZ**, a.k.a. "Memin" (hereinafter, "MONTANEZ"); and

h. **Pablo LEBRON-RIVERA**, a.k.a. "Carlos," a.k.a. "Carlos Nueva," a.k.a. "Carlos Mona" (hereinafter, "LEBRON-RIVERA"),

charging that beginning at least in or about July 2011 and continuing until the present, each did knowingly and intentionally combine, conspire, confederate, and agree with each other and with others known and unknown, to possess with intent to distribute a kilogram or more of heroin, a Schedule I controlled substance, and five kilograms or more of cocaine, a Schedule II controlled substance, in violation of Title 21 United States Code, Sections, 841(a)(1), 841(b)(1)(A), and 846.

---

[1] Based on intercepted communications, it appears that RAMIREZ-RODRIGUE is currently in the Dominican Republic.

4

8.     This affidavit is also being submitted in support of search warrants for the following target locations, which are described in greater detail later in this Affidavit and in attachments to the warrant applications and warrants:

      a.  81 Phillips Street, First Floor Rear Apartment, Lawrence, Massachusetts

      b.  10 Diamond Street, Apartment 19, Lawrence, Massachusetts; and

      c.  87 Kiely Road, Dedham, Massachusetts.

9.     This affidavit does not set forth all the facts developed during the course of this investigation. Rather, it sets forth only those facts that are necessary and sufficient to establish probable cause to believe that the defendants identified herein have committed and will continue to commit the above-described controlled substance offenses, and that evidence, fruits, and instrumentalities of these offenses will be found in the above described target locations.

10.     I have personally participated in the investigation of the subjects named in this affidavit since the fall of 2010. I am familiar with the facts and circumstances of this investigation based on information I have received from a variety of sources, including my own personal participation in the investigation, oral and written reports made to me by other law enforcement officers, physical surveillance, debriefings of confidential informants and cooperating witnesses, public records, business records, telephone toll records, pen register and trap-and-trace data, court authorized GPS tracking and cell-phone location tracking, and my review of recordings and transcripts from court-authorized wiretaps, and summaries of wiretap interceptions.

## SUMMARY OF EVIDENCE

## I.    BACKGROUND OF THE INVESTIGATION

11.    This investigation arose from a separate wiretap investigation that resulted in the 2009 indictment of eight individuals and the seizure of approximately 54 kilograms of cocaine. Cooperating witnesses in that investigation provided information about an unindicted and elusive co-conspirator they knew only as "Cesar."

12.    "Cesar" is Jovhan SALDANA, the leader of a high-volume heroin and cocaine trafficking organization (the "SALDANA DTO"). The SALDANA DTO has employed least seven individuals—RAMIREZ-RODRIGUE, FRANCO, MARTINEZ-TIBURCIO, CUADRADO-ALMODOVA, LOPEZ-SANTOS, and two unidentified males—to distribute substantial quantities of heroin and cocaine in eastern Massachusetts. The SALDANA DTO has obtained narcotics from several suppliers, including: ███████████████████████ MONTANEZ, and LEBRON-RIVERA, along with their associates.[2]

13.    Since July 25, 2011, the Honorable Joseph L. Tauro, United States District Judge, District of Massachusetts, has signed eight orders authorizing the interception of wire communications to and from twelve cellular telephones used by SALDANA DTO members and their suppliers, including SALDANA, RAMIREZ-RODRIGUE, FRANCO, MONTANEZ, and LEBRON-RIVERA. Interceptions over a telephone used by SALDANA are ongoing. Information regarding the wiretaps obtained in this investigation is summarized in the chart below:

---

[2]  I am aware of several other identified narcotics suppliers to the SALDANA DTO. Because the investigation is ongoing, I am not including their names herein.

6

| Telephone Number | Primary User During Period of Interception | Dates of Interception |
|---|---|---|
| (978) 397-0088 ("Target Telephone #1") | RAMIREZ-RODRIGUE | 7/25/2011 - 9/21/2011 |
| (978) 397-6578 ("Target Telephone #2") | RAMIREZ-RODRIGUE | 8/23/2011 - 9/21/2011 |
| (978) 397-8781 ("Target Telephone #3") | FRANCO | 8/23/2011 - 9/21/2011; 11/1/2011 - 12/30/2011 |
| (978) 208-9479 ("Target Telephone #4") | RAMIREZ-RODRIGUE | 9/19/2011 - 9/30/2011 |
| (978) 390-7184 ("Target Telephone #5") | RAMIREZ-RODRIGUE | 11/3/2011 - 12/1/2011 |
| (508) 375-8814 ("Target Telephone #6") | RAMIREZ-RODRIGUE | 12/1/2011 - 12/30/2011 |
| (347) 368-5556 ("Target Telephone #7") | MONTANEZ | 12/1/2011 - 12/30/2011 |
| (301) 693-3232 ("Target Telephone #8") | LEBRON-RIVERA | 12/1/2011 - 12/30/2011 |
| (978) 457-0460 ("Target Telephone #9") | SALDANA | 4/2/2012 - 4/13/2012 |
| (978) 390-6613 ("Target Telephone #10") | SALDANA | 5/10/2012 - 5/14/2012 |
| (978) 390-1194 ("Target Telephone #11") | SALDANA | 5/24/2012 - 6/6/2012 |
| (978) 489-4921 ("Target Telephone #12") | SALDANA | 6/15/2012 – present |

14.    Throughout this affidavit, I describe numerous intercepted calls and identify the participants in those calls. Those identifications are based on a combination of several factors, including the following:  intercepted statements concerning the user's location or activity that

7

were consistent with ongoing physical or electronic surveillance; use of known names or aliases; and voice comparisons with instances in which the speaker is known to have participated in an intercepted call.

15. Based in part on intercepted communications and surveillance conducted over the course of this investigation, agents have seized approximately 15.5 kilograms of heroin, two kilograms of cocaine, and approximately $400,000 in suspected drug proceeds from the SALDANA DTO and its suppliers.

## II. SUMMARY OF NARCOTICS AND MONEY SEIZURES

### a. August 8, 2011: Seizure of Approximately $78,120 in Drug Proceeds From _____ Following Narcotics Delivery to SALDANA DTO.

16. On August 6 and August 7, 2011,

, RAMIREZ-RODRIGUE, and SALDANA made arrangements for ___ to have a female courier deliver approximately four-and-a-half kilograms of heroin to RAMIREZ-RODRIGUE, and for RAMIREZ-RODRIGUE to pay approximately $78,000. A sample of intercepted calls, corresponding surveillance, and the seizure of $78,120, are summarized below.

17. On August 6, 2011, at approximately 1:43 p.m., Target Telephone #1 received an incoming call from (347) 231-4478, and RAMIREZ-RODRIGUE spoke to ___ whom this investigation has established is a New York-based heroin supplier to the SALDANA DTO.



8



███ said he had been talking to the "little one," who would call RAMIREZ-RODRIGUE soon.[4] ███ asked, "Who is the boss right now, you, or who is it?" RAMIREZ-RODRIGUE responded, "We are here." ███ said that he "already arranged something with him" for the "eight dollars that are pending." ███ continued, "[Y]ou're going to have that lined up and something that he and I talked about already. He said he was going to call you so you can line that up." ███ further stated that he was "going to send the girl" to RAMIREZ-RODRIGUE the next day. RAMIREZ-RODRIGUE asked if the girl was going to come early. ███ said he would not tell RAMIREZ-RODRIGUE when the girl would arrive, and asked if RAMIREZ-RODRIGUE had a "Blackberry cell phone." RAMIREZ-RODRIGUE said he did not. ███ responded, "You're going to have to buy one. Because we are, from now on, we're going to talk by writing." ███ said this was how he communicated with the people "from the south" who "send [him] the packages. They don't talk on the phone." ███ then discussed the arrival of the girl, and said that the "people who are driving the airplane" know the girl. The parties continued to discuss the arrival of "the girl." ███ then stated, "[F]ive dollars is what I'm going to send you guys. From that ball." ███ added that he "already coordinated with him. He's going to tell you what you're going to save for me."

18.    I believe that ███ called RAMIREZ-RODRIGUE to communicate some of the details of a narcotics transaction that ███ had negotiated with SALDANA ("the little one" [5]

---

[4] Throughout this affidavit, quotations from intercepted conversations are derived from preliminary draft transcripts and/or synopses ("line sheets") of conversations that occurred in Spanish. The line sheets are subject to revision upon finalization. My interpretation of the calls, which often use coded language and slang, is based in part on my training, experience and knowledge of this investigation, as well as the training, experience, and knowledge of other agents involved in this investigation.

[5] SALDANA"s Rhode Island driver"s license listed his height as 5"3". This is consistent with agents" observations of SALDANA.

9

whom ▮ "already arranged something with"); that the SALDANA DTO owed ▮ $80,000 ("eight dollars"); that ▮ would send his courier, ▮ ("the girl"), to deliver five kilograms of heroin ("five dollars"); that ▮ would take from a larger quantity of narcotics ("that ball") and pick-up the money owed by the SALDANA DTO; and that the courier intended to take a different bus or van ("flight") than the one she usually took to make deliveries. I further believe that ▮ instructed RAMIREZ-RODRIGUE to purchase a Blackberry device in order to communicate about narcotics transactions the same way that ▮ communicated with his own narcotics sources (the people "from down south" who "send [him] the packages," referring to narcotics shipments). The parties spoke again later that day and the following morning regarding, among other things, the use of Blackberry devices and arrangements for ▮ meeting with the SALDANA DTO.

19. On August 7, 2011, at approximately 2:58 p.m., Target Telephone #1 received an incoming call from telephone number (374) 490-0911, and RAMIREZ-RODRIGUE spoke to ▮ asked if RAMIREZ-RODRIGUE had been calling her.[6] RAMIREZ-RODRIGUE said, "I was calling to see if you are coming today or not." ▮ said she was coming, but didn't know when, adding, "the bus has a schedule," and noting that "I was just talking to the guy[;] he asked me if I can go down there." ▮ continued, "I know you guys are waiting for me[,] but I really don't like going at this time. I'm only doing it for you guys." ▮ stated she would take the 5:00 p.m. or the 8:00 p.m. bus. RAMIREZ-RODRIGUE asked if she would leave the following morning. ▮ said, "No, you know I have my taxi driver." RAMIREZ-RODRIGUE said, "I wanted to check the stuff because last

---

[6] At approximately 2:54 p.m. and 2:55 p.m., outgoing calls were placed from Target Telephone #1 to telephone number (374) 490-0911. The calls went to voicemail. No messages were left.

10

time I had some problems." RAMIREZ-RODRIGUE continued, "Sometimes when the stuff is not peeled[,] the weight is different from when it's peeled." RAMIREZ-RODRIGUE stated he wanted to "peel a package and see if the weight is the same." ⬛ responded that she did not intend to wait around "because he does not pay [her] enough" to wait. RAMIREZ-RODRIGUE responded that she had to wait because he did not want to "be short like the last time." RAMIREZ-RODRIGUE explained, "The last time he said there was going to be five plantain." But when he "peeled the "plantain," it was not five of them." ⬛ responded, "No. But . . . they already know that when they are un-wrapped it weighs less." RAMIREZ-RODRIGUE affirmed, and ⬛ added, "I don't want to stay because he does not pay me what he should[,] and I don't like to stay." RAMIREZ-RODRIGUE told ⬛ to call him and said that "Gordo is going to be here." ⬛ said she would call when she "take[s] off."

20. I believe that ⬛ confirmed she would take the 5:00 or 6:00 p.m. bus to Boston from New York to deliver narcotics on behalf of ⬛ that RAMIREZ-RODRIGUE wanted her to stay long enough for him to examine the narcotics ("I wanted to check the stuff because last time I had some problems."); that specifically, RAMIREZ-RODRIGUE wanted to open ("peel") a package ("plantain," likely referring to a kilogram of heroin) to weigh it; that ⬛ did not want to stay long enough to allow RAMIREZ-RODRIGUE to examine the package because ⬛ did not pay her enough to justify staying longer; and that RAMIREZ-RODRIGUE confirmed that CUADRADO-ALMODOVA ("Gordo") would be at the location where ⬛ would make the delivery.

21. At approximately 4:48 p.m., Target Telephone #1 received an incoming call from telephone number (347) 231-4478, and RAMIREZ-RODRIGUE spoke again to ⬛ said he was calling to inform RAMIREZ-RODRIGUE that he was going to "break apart one" of the

11

packages to confirm the "amount that I know that it yields." RAMIREZ-RODRIGUE said he was going to ask▮ to have "the girl" wait for him to open a package. ▮ said that instead, he would break apart one package and weight it "so things would be clear." ▮ explained that "it's going to be . . . broken apart when it comes." RAMIREZ-RODRIGUE questioned why the package would be "broken apart," noting that one that he "peeled" did not break apart. ▮ responded, "What I'm going to do is give it with a "manifest paper."" ▮ further state that the contents of the package would not be "ground" up, but might be broken apart. ▮ later told RAMIREZ-RODRIGUE that he would call RAMIREZ-RODRIGUE and confirm the "flight." RAMIREZ-RODRIGUE suggested that ▮ "call . . . when the woman is about to leave." ▮ affirmed and asked RAMIREZ-RODRIGUE, "[Y]ou saved what I reminded you about, right?" RAMIREZ-RODRIGUE affirmed. ▮ then asked, "[Y]ou have the eight set aside for me, right?" RAMIREZ-RODRIGUE affirmed again.

22.    I believe that▮ sought to assure RAMIREZ-RODRIGUE that he would weigh a sample package of narcotics himself to ensure that RAMIREZ-RODRIGUE was receiving the correct quantity; that because▮ was opening a package of narcotics to weigh it, RAMIREZ-RODRIGUE should expect that one of the packages would be "broken apart," but not "ground" up; that RAMIREZ-RODRIGUE was in the past able to peel a package and weigh the contents without having the block of narcotics break apart; that▮ agreed to call RAMIREZ-RODRIGUE when▮ was departing with the drugs; and that RAMIREZ-RODRIGUE agreed to provide $80,000 to▮ ("have the eight set aside").

23.    At approximately 8:23 p.m., Target Telephone #1 received an incoming call from (347) 490-0911, and RAMIREZ-RODRIGUE spoke again with▮ ▮ said she was about board the bus; that the bus would arrive around midnight, and that she would meet

12

them around 1:00 a.m.. RAMIREZ-RODRIGUE said that "Gordo" would be there when she arrived. RAMIREZ-RODRIGUE then placed a call from Target Telephone #1 to (978) 390-0989 and spoke to CUADRADO-ALMODOVA, a.k.a. "Gordo." RAMIREZ-RODRIGUE told CUADRADO-ALMODOVA that █ just called and that she was waiting for the bus. CUADRADO-ALMODOVA acknowledged, and asked if everything was alright. RAMIREZ-RODRIGUE affirmed.

24.    At approximately 9:35 p.m., Target Telephone #1 received an incoming call from (347) 231-4478, and █ told RAMIREZ-RODRIGUE that "the person . . . is on the flight, you hear?" RAMIREZ-RODRIGUE responded, "[Y]es[,] yes, she already called me to tell me that she was about to leave." RAMIREZ-RODRIGUE later stated that he would be "waiting for her here." █ said, "We'll be in touch, you know, when she gets there." I believe that █ and RAMIREZ-RODRIGUE were discussing the impending arrival of █

25.    At approximately 10:04 p.m., Target Telephone #1 received an incoming call from (809) 323-0313, and RAMIREZ-RODRIGUE spoke to SALDANA.[7] SALDANA said he had just spoken to █ SALDANA asked RAMIREZ-RODRIGUE if the woman was "on her way over there," which RAMIREZ-RODRIGUE confirmed. SALDANA said that █ sent "four and a half." RAMIREZ-RODRIGUE said he thought █ was going to send "five." SALDANA responded, "No, it's only four and a half." SALDANA then told RAMIREZ-RODRIGUE that he thought it was going to be "sixty" "pesos" but that it would instead be "seventy pesos" plus an additional "eight" that was owed to █ SALDANA and RAMIREZ-RODRIGUE discussed the increased price and lower quality of what █ provided (describing it as a little "looser"), and other potential

---

[7] SALDANA is believed to have been in the Dominican Republic at that time.

13

narcotics deals. SALDANA told RAMIREZ-RODRIGUE that next time, he should seek a better deal from▮▮▮▮▮ RAMIREZ-RODRIGUE and SALDANA continued to discuss the state of the DTO's business. SALDANA also RAMIREZ-RODRIGUE discussed requests from unidentified individuals for portions of what▮▮▮▮▮ was delivering--for example, RAMIREZ-RODRIGUE referred to "the guy" who wanted "a whole one."

26.     I believe that SALDANA had confirmed that▮▮▮▮▮▮▮ was to deliver "four and a half" kilograms of narcotics, most likely heroin, and that RAMIREZ-RODRIGUE was to make a $78,000 payment in part for past debts owed to▮ and also in partial payment for the "four and a half" kilograms that would be delivered.

27.     Based on intercepted calls, agents initiated surveillance along the Massachusetts Turnpike late that evening, but were unable to locate the vehicle▮▮▮▮▮ was traveling in. At approximately 12:45 a.m. on August 8, 2011, surveillance agents observed a white passenger van parked near the entrance to 250 Kennedy Drive in Malden, Massachusetts, a known base of operations for the SALDANA DTO ("250 Kennedy Drive"). Agents observed a Hispanic female, who later identified herself as▮▮▮▮▮▮ (believed to be▮▮▮▮), exit the van with a blue and gray backpack and enter the lobby of 250 Kennedy Drive. Agents observed ▮▮▮▮ talking on a cell phone.

28.     On August 8, 2011, at approximately 12:37 a.m., Target Telephone #1 received an incoming call from telephone number (347) 231-4478, and RAMIREZ-RODRIGUE spoke with▮▮▮▮ told RAMIREZ-RODRIGUE to go downstairs and pick up the woman. Shortly thereafter, agents lost sight of▮▮▮▮ as she entered 250 Kennedy Drive.

29.     At approximately 1:02 a.m., agents observed▮▮▮▮▮ exit 250 Kennedy drive, where she was picked up by an unidentified male driving a blue Jeep Cherokee (Massachusetts

14

registration 2XM58, registered to Jose A. ESCOBAR; hereinafter the "Blue Jeep Cherokee"). Agents followed the Blue Jeep Cherokee to the South Station bus terminal on Atlantic Avenue in Boston, Massachusetts, where          was dropped off. Agents followed          into the bus terminal where she met an unidentified Hispanic male. Agents maintained surveillance of          and the unidentified male. After the two individuals entered the bus line, officers of the Massachusetts Bay Transit Authority ("MBTA") police department, along with a K-9 trained and certified in the detection of narcotics odor, conducted a baggage inspection of several bus passengers. The K-9 alerted to the blue and gray backpack that          had carried from 250 Kennedy Drive. Inside the backpack, law enforcement found approximately $78,120, most of which was packaged as bricks wrapped in green cellophane.          also possessed a Greyhound/Peter Pan bus ticket for          to board the August 8, 2011, 2:00 a.m. bus from Boston to New York.          told law enforcement agents on scene that, among other things, her name was          she had no identification documents in her possession; she was carrying approximately $78,000; the money was hers; and she sold jewelry and collected interest on loans.          was unable to provide any documentation that the money belonged to her. Officers seized the currency pending further investigation and did not arrest

15

 

Figure 1:    backpack containing S78,120.

Figure 2: S78,120 seized from    along with a Boston-to-New York bus ticket held by

30. On August 9, 2011, at approximately 2:11 p.m., Target Telephone #1 received an incoming call from (347) 234-1081, and RAMIREZ-RODRIGUE spoke to    told RAMIREZ-RODRIGUE that he needed a favor and that he had a "person close to" RAMIREZ-RODRIGUE.    asked if RAMIREZ-RODRIGUE could provide him with "400 dollars for [ ] to pass them along to him for him to make a . . . correction."    said he would "deliver everything" to RAMIREZ-RODRIGUE on Saturday, but that "this person" had    "behind with 80-something dollars."    ater stated that he planned to leave for "20 days" to visit the place "where we're from" and therefore needed to "resolve it this week." He further stated, "You know how I am, with the problem that I have right now, you know what I mean? That's why I'm asking you." RAMIREZ-RODRIGUE said he would provide "300" to    and asked if that would be enough.    said he had wanted "500" and that there was a "ninety-nine percent chance that [he would] leave [RAMIREZ-RODRIGUE] with eight or nine." RAMIREZ-RODRIGUE asked, "[W]hat did you resolve with the girl?"    responded, "Man, that's going to be lost."    further stated that he and the girl met with a lawyer and determined that it was possible to claim the seized money if the girl provided documentation (a "checkbook") that she

16

earned the money through loan repayment and jewelry sales, as she told police, but the "problem" was that she would be asked, "why didn't she pay taxes for that?" █████ continued, "In twenty -something years[,] nothing had ever happened to me, but right now this little problem has presented itself. RAMIREZ-RODRIGUE said he would give ████ "three hundred," adding, "Tell the man that we're going to get you three hundred." ████ replied, "Let's just say three and a half . . . to see if he doesn't kick the crap out of me." ████ said he would give RAMIREZ-RODRIGUE's telephone number to an individual who would contact RAMIREZ-RODRIGUE to make arrangements.

31.     I believe that ████ informed RAMIREZ-RODRIGUE that he was approximately $80,000 in debt to his drug supplier ("behind with 80-something dollars") because of the seizure of approximately $78,120 from ████ at South Station on August 8, 2011; that ████ had considered trying to reclaim the money seized from ████ but that the money was likely "lost"; that ████ sought $400,000 from RAMIREZ-RODRIGUE to cover both the approximately $80,000 loss and to pay for an anticipated shipment of "eight or nine" kilograms of narcotics for the SALDANA DTO; and that RAMIREZ-RODRIGUE ultimately agreed to provide ████ approximately $350,000 ("three and a half") to an unidentified individual working on behalf of ████████ A subsequent series of intercepted establish that RAMIREZ-RODRIGUE enlisted MARTINEZ-TIBURCIO to deliver approximately $357,000 to an unidentified courier for ████.

### b. September 26, 2011: Seizure of 2 Kilograms Heroin From ████████ En Route to SALDANA DTO

32.     On September 25 and 26, intercepted calls establish that RAMIREZ-RODRIGUE and CUADRADO-ALMODOVA used Target Telephone #4 to arrange for a two-kilogram heroin shipment from ████████. That shipment was seized by law enforcement while ████ was on his way to meet SALDANA DTO members at 250 Kennedy Drive in Malden.

17

33. On September 25, 2011, at approximately 5:46 p.m., Target Telephone #4 received an incoming call from (978) 912-2746, and          told RAMIREZ-RODRIGUE that          had "two and a half kilo, which is a lot of money, you understand?" RAMIREZ-RODRIGUE affirmed and spoke with          about purchasing either "one "muchacho" or "one and a half muchachos." After further discussion, RAMIREZ-RODRIGUE and          agreed to conduct the transaction the next day.          told RAMIREZ-RODRIGUE, "Remember, the price is a whole lot cheaper than the one Carlos and I give to you." RAMIREZ-RODRIGUE affirmed. I believe that the "two and a half kilo" described by          referred to narcotics, and that RAMIREZ-RODRIGUE suggested he would purchase either one or one-and-a-half kilograms ("muchachos," literally "guys") of the narcotics the following day.

34. The next day, September 26, 2011, at approximately 11:58 a.m., Target Telephone #4 received an incoming call from (978) 912-2746, and RAMIREZ-RODRIGUE asked          "[A]t how much did you say that was?"          answered, "with the seven, zero." RAMIREZ-RODRIGUE told          that the price was "expensive" and that "there is a guy who told [RAMIREZ-RODRIGUE] it was six and a half." The two continued to negotiate what I believe to be the price of narcotics.          stated, "Tell me what we have to do so we can do business." RAMIREZ-RODRIGUE responded, "Put it to me with the six, five to see if we can do something."          agreed: "Okay, that's done." RAMIREZ-RODRIGUE asked          to give him "one and a half or one." After continued negotiation,          told RAMIREZ-RODRIGUE, "Take the two[;] take the two[;] don't worry about it." RAMIREZ-RODRIGUE agreed.

18

35. I believe that [ ] initially proposed a per-kilogram price of $70,000 ("with the seven, zero"), which is consistent with the retail price of heroin and which RAMIREZ-RODRIGUE rejected as too expensive; that the parties eventually agreed to a price of $65,000 per kilogram ("with the six, five"); and that RAMIREZ-RODRIGUE agreed to receive two kilograms of heroin from [ ] ("Take the two[;] take the two[;] don't worry about it.").

36. At approximately 12:17 p.m., Target Telephone #4 received an incoming call from (978) 912-2746, and RAMIREZ-RODRIGUE asked [ ], "Are you the one who is going to bring it?" [ ] affirmed. The parties then discussed the logistics of the meeting, and agreed to talk later.

37. At approximately 2:18 p.m., Target Telephone #4 received an incoming call from (978) 912-2746, and [ ] told RAMIREZ-RODRIGUE, "I'm going with my girl because I haven't seen her in a while." [ ] added, "I will bring her myself." As discussed below, [ ] "girl" likely referred to a juvenile female who may have been the daughter of [ ] girlfriend, and was a passenger in [ ] vehicle when law enforcement stopped the vehicle.

38. Later, starting at approximately 3:13 p.m., [ ], RAMIREZ-RODRIGUE, and CUADRADO-ALMODOVA (who at the time was sharing Target Telephone #4 with RAMIREZ-RODRIGUE) engaged in a series of conversations regarding logistics for the narcotics transaction. [ ] provided his location at various times and received further directions from RAMIREZ-RODRIGUE and CUADRADO-ALMODOVA. Based on the landmarks and intrastate route names referenced in those conversations, I believe

19

that RAMIREZ-RODRIGUE and CUADRADO-ALMODOVA attempted to direct ▮▮▮
▮▮▮ to the area of 250 Kennedy Drive in Malden.

39.    At approximately 3:32 p.m., RAMIREZ-RODRIGUE placed an outgoing call on Target Telephone #4 to (978) 912-2746, and ▮▮▮ instructed RAMIREZ-RODRIGUE: "Tell him to come meet me here, you know." RAMIREZ-RODRIGUE told ▮▮▮ to "wait a moment" and then CUADRADO-ALMODOVA continued the conversation with ▮▮▮ ▮▮▮ over Target Telephone #4, providing further directions. ▮▮▮ stated he was "at the gas station on ninety nine. Pick me up. Pick me up." CUADRADO-ALMODOVA instead again provided further directions. At approximately 3:40 p.m., Target Telephone #4 received an incoming call from (978) 912-2746, and ▮▮▮ told CUADRADO-ALMODOVA that he was at the "Petroleum King" gas station "between ninety nine and sixty." CUADRADO-ALMODOVA provided further directions to a location believed to be 250 Kennedy Drive in Malden.

40.    During the above call, surveillance agents observed a gray Mitsubishi Endeavor bearing Massachusetts registration 49N950 (hereinafter, the "Gray Mitsubishi Endeavor") containing ▮▮▮ and a juvenile female at the Petroleum King gas station on Salem Street in Malden, Massachusetts, near the intersection of Route 99 and Route 60. Agents observed ▮▮▮ using a cellular telephone.

41.    Shortly thereafter, an officer from the Malden Police Department observed the Gray Mitsubishi Endeavor run a red light while taking a left turn from the right lane of eastbound traffic on Salem Street to head north on Broadway (Route 99). The officer conducted a traffic stop of the vehicle. During the traffic stop, Target Telephone #4 received an incoming call from (978) 912-2746. CUADRADO-ALMODOVA answered the call and stated, "Tell me

20

man." �per stated, "They have me stopped . . . [T]hey have me stopped here, the blue ones." CUADRADO-ALMODOVA asked, "What?" ▯ repeated, "The blue ones have me stopped." CUADRADO-ALMODOVA affirmed, and the call ended.

42. The officer asked ▯ for his license and registration. ▯ apologized for running the red light. ▯ provided a New Hampshire driver's license bearing his picture and the name ▯ . ▯ originally stated that the vehicle belonged to his wife, but later said that it belonged to a friend. ▯ was shaking and appeared nervous. While the Malden Police Officer was writing a ticket for the traffic violation, a Massachusetts state police trooper stopped to provide assistance. The state trooper observed in plain view in the car's interior, an amber prescription pill bottle with the prescription label removed. The bottle contained unidentified pills. Officers asked ▯ to step out of the car, and conducted a pat frisk. Officers obtained ▯ verbal consent to search the vehicle. The state trooper then drafted a written consent to search the vehicle. The female passenger explained the consent form to ▯ in Spanish, and he signed it.

43. With the assistance of a K-9 unit, agents subsequently located two kilograms of suspected heroin in a hidden compartment behind the speedometer of the Gray Mitsubishi Endeavor. Laboratory analysis has confirmed that the substance was heroin weighing almost two kilograms.

21

 

Figure 3: Hidden compartment in dashboard of [REDACTED] vehicle.

Figure 4: Approximately two kilograms of heroin, prescriptions bottles containing controlled substances, and the cell phone used to communicate with the SALDANA DEO, which were seized from [REDACTED] vehicle.

44.               was arrested on Massachusetts charges of Trafficking a Controlled Substance (heroin).[8]  It was also discovered that           was wanted in Massachusetts for drug trafficking violations out of Plymouth County Court from 1993.         had previously been deported and was unlawfully present in the United States.        eventually posted bail and was released, but was taken into custody by Immigration and Customs Enforcement and deported to the Dominican Republic.

45.      On September 27, 2011, at approximately 9:59 a.m., Target Telephone #4 received an incoming call from (617) 888-8445, and RAMIREZ-RODRIGUE spoke to an individual later identified as MONTANEZ. RAMIREZ-RODRIGUE asked MONTANEZ if he "had heard anything from the man." MONTANEZ told RAMIREZ-RODRIGUE, "Oh yes, he's there, they have him." RAMIREZ-RODRIGUE asked, "An[d] the thing? There on the stretch?" MONTANEZ replied, "Yes." MONTANEZ asked, "Was it one shirt?" RAMIREZ-

---

[8]              was also charged with: providing a false name at booking; possession of a Class E Controlled Substance (tacrolimus and hydrocholorothiazide); and possession of a false license.        has also used the names             and [REDACTED] In addition, a family member who arrived at the police station on the day of his arrest referred to him as "Tony."

22

RODRIGUE replied, "I'm waiting for two, he was supposed to bring two shirts." MONTANEZ said, "Oh, two shirts." RAMIREZ-RODRIGUE affirmed. MONTANEZ told RAMIREZ-RODRIGUE to "keep going forward." RAMIREZ-RODRIGUE replied, "No, I have to see what happened so I can go forward . . . fuck." MONTANEZ told RAMIREZ-RODRIGUE, "I will see if I can help him with something . . . I will see . . . I'm make an effort to see . . . see if he can get bail, you understand?" RAMIREZ-RODRIGUE affirmed. The two continued their conversation, and MONTANEZ agreed to report back to RAMIREZ-RODRIGUE after his attempt to acquire information about the arrest of

46.     I believe that RAMIREZ-RODRIGUE called MONTANEZ to inquire about the police stop of          that MONTANEZ informed RAMIREZ-RODRIGUE that was arrested ("they have him"); that RAMIREZ-RODRIGUE asked MONTANEZ about the heroin that          was delivering to RAMIREZ-RODRIGUE ("An[d] the thing? There on the stretch?"); that MONTANEZ confirmed that the heroin was seized and asked about the number of kilograms ("shirts") that RAMIREZ-RODRIGUE was going to receive; that RAMIREZ-RODRIGUE said he had been waiting for two kilograms ("he was supposed to bring two shirts"); that MONTANEZ told RAMIREZ-RODRIGUE to continue to distribute narcotics ("keep going forward man"); and that RAMIREZ-RODRIGUE expressed concern about the arrest of          and sought further details ("No, I have to see what happened so I can go forward."). RAMIREZ-RODRIGUE ceased use of Target Telephone #4 on or about September 27, 2011. Based on subsequent intercepted, I believe that MONTANEZ helped to raise bail money for

### c. **November 18, 2011: $170,310 of Suspected Drug Proceeds Seized from**

47.     A member of the ▮▮ DTO helped arrange for the November 18, 2011 pick-up of drug proceeds from 250 Kennedy Drive in Malden. On November 18, 2011, ▮▮▮▮▮ a courier for the ▮▮ DTO, was observed at 250 Kennedy Drive. Later that day, law enforcement agents seized approximately $170,310 in suspected drug proceeds from ▮▮▮ while he was traveling in a passenger van back to New York. Telephone calls and surveillance surrounding this incident are summarized below.

48.     On November 17, 2011, at approximately 8:39 p.m., RAMIREZ-RODRIGUE placed an outgoing call on Target Telephone #5 to (347) 904-0414 and spoke to ▮▮ son, ▮▮▮. RAMIREZ-RODRIGUE told ▮▮▮ that "Viejo" was supposed to call RAMIREZ-RODRIGUE that night "to see if the guy is going to come tomorrow or what?" ▮▮▮ said he would call "Viejo" and asked RAMIREZ-RODRIGUE what he should tell "Viejo." RAMIREZ-RODRIGUE responded that there would be around "160 or 170." ▮▮▮ said he would let "Viejo" know and would call back RAMIREZ-RODRIGUE.

49.     At approximately 8:48 p.m., Target Telephone #5 received an incoming call from (347) 904-0414, and ▮▮▮ told RAMIREZ-RODRIGUE, "I'm going to send the guy, you know what I mean?" RAMIREZ-RODRIGUE affirmed, and the two discussed "bus" schedules and the timing of "the guy's" arrival in Malden, stating he would arrive around noon. The parties also discussed "papers," likely referring to payment for narcotics.

50.     The next morning, November 18, 2011, agents established surveillance in the area of 250 Kennedy Drive in Malden.

51.     At approximately 8:58 a.m., RAMIREZ-RODRIGUE received an incoming call over Target Telephone #5 from (347) 972-5241, and RAMIREZ-RODRIGUE spoke to a then-

24

unidentified male, who said he was "here in Boston." RAMIREZ-RODRIGUE told the caller that he would be at the house in a little while.

52.    At approximately 9:18 a.m., I observed a Hispanic male carrying a black gym bag walk along the west-side entrance of 250 Kennedy Drive and proceed to the rear door where he entered the building. The then-unidentified male was in his early thirties with a tall, medium build. He wore a baseball cap, grey hooded sweatshirt, and blue jeans. He placed the sweatshirt hood over his head before he entered the rear door of 250 Kennedy Drive. This individual was later identified as

53.    At approximately 10:43 a.m., I observed RAMIREZ-RODRIGUE exit the rear door of 250 Kennedy Drive and depart in a gray Mitsubishi Endeavor bearing Massachusetts registration 335NR8, registered to Randy R. Baez, 163 West Street, #1, Lawrence, MA 01841-3440 (hereinafter, the "Gray Mitsubishi Endeavor").

54.    At approximately 11:21 a.m., RAMIREZ-RODRIGUE received an incoming call over Target Telephone #5 from CUADRADO-ALMODOVA, who asked RAMIREZ-RODRIGUE whether "someone from the bus company" had called him. RAMIREZ-RODRIGUE said, "No." CUADRADO-ALMODOVA stated that he had provided RAMIREZ-RODRIGUE's number and laughed. At approximately 11:53 a.m., RAMIREZ-RODRIGUE and CUADRADO-ALMODOVA spoke again. RAMIREZ-RODRIGUE stated, "The bus company people have not called. Tell him to call them again to see, just in case." CUADRADO-ALMODOVA said, "He called them, yes," and "he is going to be the last to be picked up." I believe that RAMIREZ-RODRIGUE and CUADRADO-ALMODOVA discussed arrangements to have          picked up from 250 Kennedy Drive and that RAMIREZ-RODRIGUE,

who had left 250 Kennedy Drive, directed CUADRADO-ALMODOVA to instruct [        ] to call the bus company again to arrange for [        ] pick-up.

55.     At approximately 12:07 p.m., Target Telephone #5 received an incoming call from (617) 524-0585, and an unidentified female stated, "You can come outside, sir. The bus is arriving." Approximately one minute later, RAMIREZ-RODRIGUE called CUADRADO-ALMODOVA and said, "Tell him to come down, that the bus is arriving." CUADRADO-ALMODOVA affirmed. I believe that the bus service contacted RAMIREZ-RODRIGUE at the number CUADRADO-ALMODOVA had provided, and that RAMIREZ-RODRIGUE, in turn, instructed CUADRADO-ALMODOVA to tell [        ] to wait outside 250 Kennedy Drive for the bus.

56.     At approximately 12:14 p.m., a surveillance agent observed a blue Ford van bearing livery plate LV58456 (hereinafter, the "Blue Ford Van") enter the 250 Kennedy Drive apartment complex. At approximately 12:15 p.m., other agents and I observed the Blue Ford Van arrive at 250 Kennedy Drive and then proceed backwards down the west-side driveway by the main entrance. At the same time, surveillance agents saw the same Hispanic male carrying the same black gym bag he entered with, which appeared to be weighted, exit the north side door of 250 Kennedy Drive and approach the blue van. The Hispanic male entered the van with the bag, and the van departed.

57.     At approximately 4:00 p.m., the New York State Police conducted a traffic stop of the Blue Ford Van. This stop resulted in the identification of [        ] of New York and the seizure of approximately $170,310 from the same black gym bag [        ] carried to and from 250 Kennedy Drive. I believe that [        ] was transporting narcotics proceeds (specifically, payment for the narcotics delivered to the SALDANA DTO) to

26

New York, as generally described in the above-referenced calls between RAMIREZ-RODRIGUE and                    (in which RAMIREZ-RODRIGUE stated that there would be around "160 or 170," referring to $160,000 or $170,000).                    was not arrested. He did not identify the origin of the seized currency.

58.     Following the traffic stop, there were numerous calls between RAMIREZ-RODRIGUE and members of the          DTO. At approximately 4:08 p.m., Target Telephone #5 received an incoming call from (809) 326-1270, and RAMIREZ-RODRIGUE spoke to          , who was in the Dominican Republic at the time.          told RAMIREZ-RODRIGUE, "Damn! The guy is calling me; the bus was pulled over man." RAMIREZ-RODRIGUE replied, "Really? Damn it!"          continued, "[H]e called me that . . . [stutters] that the bus was stopped and they are asking for ID." RAMIREZ-RODRIGUE told          that the male had left at 12:00 p.m. and that because it was 5:00 p.m., the male had to be almost in New York.          stated, "Let's wait for the greater power of God." RAMIREZ-RODRIGUE responded, "Yes, but he has to drop that and put that away, around there, if anything." I believe that          called RAMIREZ-RODRIGUE to inform him that                    had been stopped by police, and that RAMIREZ-RODRIGUE indicated that                    should conceal or abandon the money ("drop that and put that away").

59.     At approximately 4:37 p.m., RAMIREZ-RODRIGUE placed an outgoing call from Target Telephone #5 to (347) 904-0414 and spoke again with          son,          RAMIREZ-RODRIGUE asked          about his brother.          stated, "We think that he's in trouble right now." RAMIREZ-RODRIGUE stated, "Yes, because your dad called me, and told me that his bus was pulled over, and I told him that if it was stopped[,] it must have been almost getting there, because he left from here like three hours ago."          a said that

27

his brother had not yet called again. RAMIREZ-RODRIGUE stated, "[G]od willing at least he drops that there" and says "that doesn't belong to him." ▮▮▮▮ affirmed. RAMIREZ-RODRIGUE continued, "Of course, so he [STUTTERS] says "[T]hat is not mine. I don't know." Right?" ▮▮▮▮ replied, "God willing."

60.    At approximately 4:59 p.m. RAMIREZ-RODRIGUE received an incoming call from (617) 524-0585, a telephone number believed to be used by Geraldo's Transportation Company. An unidentified female asked RAMIREZ-RODRIGUE if someone left his residence traveling to New York from 250 Kennedy Drive. RAMIREZ-RODRIGUE replied "No, no[,] no." The female asked if she had the wrong number, and RAMIREZ-RODRIGUE replied, "Yes."

61.    Approximately one minute later, RAMIREZ-RODRIGUE called ▮▮▮▮ again from Target Telephone #5. ▮▮▮▮ said there was "no news yet." RAMIREZ-RODRIGUE stated, "[T]hey were calling me, you know. . . [STUTTERS] He called from my phone to make the bus reservation." ▮▮▮▮ affirmed. RAMIREZ-RODRIGUE continued, "And they called me from ▮▮▮▮ just now and they asked me if someone had traveled from 250 Kennedy Drive. . . And I told them no." ▮▮▮▮ said, "Oh my God." He later stated, "They must already have him, for sure." RAMIREZ-RODRIGUE stated, "When he arrived at the bus, he should have left the bag around there, and have tried not to draw attention to himself and the bag."

### d.  Removal of Items from 250 Kennedy Drive

62.    Shortly after his conversation with ▮▮▮▮, RAMIREZ-RODRIGUE spoke with FRANCO, CUADRADO-ALMODOVA, and MARTINEZ-TIBURCIO about removing

28

items from 250 Kennedy Drive in response to the police stop of the van that was carrying

██████████.

63.     For example, in a call placed from Target Telephone #5 at approximately 5:02 p.m., RAMIREZ-RODRIGUE told FRANCO that they needed to "go up there tonight and take out what is there" and move it to "another room" that "Chifuco" (i.e., MARTINEZ-TIBURCIO) had the key for. Next, in a call placed from Target Telephone #5 about two minutes later, RAMIREZ-RODRIGUE told CUADRADO-ALMODOVA that he "just called Ruby [i.e., FRANCO] now, and what I'm thinking is to go up there and take out everything that's over there, just in case." RAMIREZ-RODRIGUE further said he wanted to "go and take it out, and take it to the other house . . . At least the two things . . . with everything that is inside. . . . Because you know how it is. You never know, and because it is so recent."

64.     Based in part on the above-referenced calls, I established surveillance at the rear parking lot of 250 Kennedy Drive. At approximately 6:20 p.m., I saw FRANCO arrive in a gray Honda Pilot bearing Massachusetts registration 332LY5 (registered to Xiomara DIAZ-CRUZ, 4 Inman Street, Apt. 6, Lawrence MA 01843; hereinafter, the "Gray Honda Pilot"). FRANCO walked around to the east side of the building and out of sight. At approximately 6:30 p.m., I saw RAMIREZ-RODRIGUE and CUADRADO-ALMODOVA arrive at 250 Kennedy Drive in the Gray Mitsubishi Endeavor. Both entered the rear door of the building. Shortly thereafter, RAMIREZ-RODRIGUE, CUADRADO-ALMODOVA, and FRANCO began moving various object out of 250 Kennedy Drive and loading them into their vehicles. Among the items they removed and loaded into their vehicles was a large bedroom dresser.



Figure 5: RAMIREZ-RODRIGUEZ and CUADRADO-ALMODOVA removing a white dresser from 250 Kennedy Drive. The camera time stamp is approximately one hour fast.

65.     Shortly after 7:00 p.m., while I was watching CUADRADO-ALMODOVA and FRANCO load boxes into the Gray Honda Pilot, MARTINEZ-TIBURCIO arrived and met with them. All three individuals returned to the back door of 250 Kennedy Drive. All four SALDANA DTO members continued to carry various objects, including boxes, what appeared to be cooking pots, a tool box, and a vacuum cleaner, from 250 Kennedy Drive to their vehicles.

66.     At approximately 7:21 p.m., I saw CUADRADO-ALMODOVA and MARTINEZ-TIBURCIO walk away from the Gray Mitsubishi Endeavor and enter a red Ford Escape with New Hampshire registration 3212007, registered to Landa F. MARTINEZ PEGUERO of 3 Beech Street, Apartment 2, Nashua, New Hampshire (hereinafter, the "Red Ford Escape").

67.     The parties then departed in the Gray Honda Pilot, the Gray Mitsubishi Endeavor, and the Red Ford Escape. All three vehicles followed each other with the Red Ford Escape leading the way. The vehicles traveled on Route 1 northbound, generally staying in the right lane and driving at a speed much less than the posted speed limit. Surveillance was terminated on Route 1. Based in part on GPS data, agents believe that the vehicles traveled to a multi-unit

30

apartment complex named Lynnfield Commons, located at 375 Broadway in Lynnfield, Massachusetts, where MARTINEZ-TIBURCIO leased an apartment..

68. Based on intercepted calls during December 2011, and surveillance that month and during January and February, I believed that 375 Broadway was a stash location. The use of an apartment for that purpose was confirmed with the execution of a search warrant at that location in February 2012, as described below. During the execution of the search warrant, many of the above-described items, which I observed SALDANA DTO members remove from 250 Kennedy Drive, were seized from the 375 Broadway stash location.

### e. February 9, 2012: Seizure of Narcotics and Drug Proceeds, and Drug-Processing Equipment from 375 Broadway, Building 1, Apartment G-10 in Lynnfield, Massachusetts.

69. On the morning of February 9, 2012, agents executed a federal search warrant at 375 Broadway, Building 1, Apartment G-10, in Lynnfield, Massachusetts that yielded considerable evidence of narcotics trafficking. Agents obtained a search warrant after a building resident complained about strong chemical odors and suspicious activity occurring in Apartment G-10. Agents seized approximately 5.5 kilograms of heroin, 200 grams of cocaine, 4.8 grams of crack, approximately $48,990 in suspected drug proceeds, and other evidence of drug trafficking, including approximately 97 bottles of lactose (a common narcotics cutting agent), multiple blenders and coffee grinders, a hydraulic kilogram press, metal "finger" presses (commonly used to prepare heroin for distribution in 10-gram or "finger" quantities), a respirator mask labeled with the name "Chifu" (short for Chifuco, an alias for MARTINEZ-TIBURCIO), a respirator mask labeled with the name "Bija" (an alias for RAMIREZ-RODRIGUE), and notebooks containing ledgers of drug-trafficking activity. The suspected drugs, drug ledgers and currency were concealed inside the same dresser that agents observed RAMIREZ-RODRIGUE and

31

CUADRADO-ALMODOVA wheel out of 250 Kennedy Drive on November 18, 2011. The

dresser contained a motorized hidden compartment.





Figure 6: Dresser that was removed from 250 Kennedy Drive on November 18, 2011.

Figure 7: Same dresser with top removed, revealing drugs, money, and drug ledgers.

70. Consistent with a well-established pattern of activity, FRANCO arrived at 375 Broadway, Building 1, in his Gray Honda Pilot around 10:00 a.m., shortly after the search was completed, and entered 375 Broadway, Building 1. He was soon joined by other known members of the SALDANA DTO—RAMIREZ-RODRIGUE, CUADRADO-ALMODOVA, MARTINEZ-TIBURCIO, and LOPEZ-SANTOS. Agents observed and videoed their arrival. The SALDANA DTO ceased using 375 Broadway as a drug stash/processing location following the execution of the warrant.

### f. December 23, 2011: Seizure of Cocaine and Heroin En Route to LEBRON-RIVERA

71. On December 23, 2011, LEBRON-RIVERA engaged in a series of conversations over Target Telephone #8 with a woman later identified as . At approximately 1:22 p.m., the parties discussed the timing of arrival. At approximately 3:23 p.m., LEBRON-RIVERA placed an outgoing call on Target Telephone #8 to , who told LEBRON-RIVERA, "I just arrived, but down here there are two badges in . . . surrounding

32

the bus." LEBRON-RIVERA asked if there were two dogs, and ██████ replied that she was not off the bus yet but, there are "guys" "around the bus." LEBRON-RIVERA told ██████ "[G]et off normally, like it's not with you, calm. Without a problem and . . . and take your taxi . . ." ██████ told LEBRON-RIVERA she did not think she would be able to get the "suitcase." LEBRON-RIVERA stressed to ██████ to take the suitcase calmly and "go with God." ██████ told LEBRON-RIVERA that "they are looking at the suitcases, here in the bus." LEBRON-RIVERA asked if "they" were opening them. ██████ replied that "they," referring to law enforcement agents, were not opening the suitcases, but were waiting for people to get off the bus and were "waiting for something." ██████ told LEBRON-RIVERA that she was going to have to "walk" "without luggage." LEBRON-RIVERA told ██████ f she saw that "they are checking people's suitcases," she should "leave everything behind." He continued, "If they are not checking, take your suitcase normally[,] like it's nothing." LEBRON-RIVERA further told ██████ not to "talk anymore through the phone." Agents believe that ██████ informed LEBRON-RIVERA that law enforcement agents ("badges") were inspecting baggage on her bus; that LEBRON-RIVERA instructed ██████ that she should leave her "suitcase" behind if she thought law enforcement would inspect its contents, but that she should otherwise take the "suitcase" without drawing attention to herself; and that LEBRON-RIVERA instructed her not to communicate further by phone.

72.     At approximately 3:52 p.m., LEBRON-RIVERA placed an outgoing call from Target Telephone #8 to (312) 735-4690, a cellular telephone used by an unknown male ("UM4690"). During the call, LEBRON-RIVERA asked the UM4690 what he had heard. UM4690 told LEBRON-RIVERA that "she" called him and said, "[T]hey were calling everybody and asking for IDs and asking where were they going." LEBRON-RIVERA and

UM4690 then discussed what "she" should say about where "she" was going. LEBRON-RIVERA told UM4690 how he was worried that when he had to meet "that woman" later that "they" would follow her. Toward the end of the conversation, LEBRON-RIVERA asked UM4690, "There were no clothes of hers there, right?" UM4690 said "No, no. Everything is fine . . . There was clothes for, for . . . from a very fat guy." Agents believe that the parties were discussing the law enforcement action occurring around          bus and whether          clothes were in her suitcase. The suitcase contained narcotics, as described below, and agents believe that the parties worried that          clothing could have enabled law enforcement to determine that the suitcase belonged to her.

73.     Agents subsequently seized approximately six kilograms heroin, two kilograms of cocaine, and a 1.4 grams of crack from an unclaimed bag on the bus. The narcotics were hidden in two cardboard children's toy boxes inside the bag. The bag also contained clothing for a large male, consistent with the description provided in the previously described call between LEBRON-RIVERA and UM4690. According to DEA laboratory analysis, the heroin purity was at least 93 percent; the cocaine purity was about 75 percent.

74.     Agents spoke with          s in both Spanish and English.          who told agents her name was          provided agents with a Tennessee Operators License bearing the name          3075 Pecan Lake Drive #106, Memphis, Tennessee.          stated that she had traveled from Memphis, Tennessee, to New York and then to Boston. She said she planned to stay in Boston for three days. She said she did not bring any luggage with her. She did not claim any bags from the bus. She voluntarily provided agents with her cell phone, and agents confirmed that the cell phone number was (901) 601-6243 (the same number over which

34

she had just been intercepted talking to LEBRON-RIVERA) before returning it to her. ▮▮▮▮
was not arrested and provided no further information.

75.     Based on intercepted calls and evidence gathered throughout this investigation, I
believe that ▮▮▮ was transporting narcotics on behalf of an Illinois-based drug-trafficking
organization; that ▮▮▮ was in the Boston area on December 23, 2011, to deliver a shipment of
narcotics to LEBRON-RIVERA, and that as a result of law enforcement activity, the shipment of
narcotics was seized.

76.     Toll records establish that on the day of the seizure, FRANCO and RAMIREZ-
RODRIGUE each placed several calls to LEBRON-RIVERA (who was using a second phone
not subject to interceptions) that went unanswered. The day of the seizure, RAMIREZ-
RODRIGUE and FRANCO spoke about their inability to reach LEBRON-RIVERA and their
understanding that LEBRON-RIVERA still did not have the narcotics "in hand." Based on these
contacts and other information gathered in the investigation, I believe that a portion of the
narcotics LEBRON-RIVERA tried to obtain was intended for the SALDANA DTO.

## III.     Analysis of Drug Ledgers Seized from 375 Broadway

77.     Multiple drug and money ledgers were seized from the 375 Broadway stash
apartment on February 9, 2012. Among other information, the ledgers indicate money flows to
and from customers, money flows to and from suppliers, and quantities and types of drugs that
were distributed by the SALDANA DTO.

78.     FRANCO expressly referred to one of the money ledgers in a call with drug
customer "Peje." Specifically, on December 28, 2011, "Peje" called FRANCO and expressed a
desire to "clear up an account." The parties discussed specific dollar amounts, and a dispute
arose as to whether "Peje" had paid "fifty, two-sixty" ($50,260) or "forty nine two sixty"

35

($49,260), as alleged by FRANCO. FRANCO explained that because he "reports to Vija"—i.e., RAMIREZ-RODRIGUE—he "writes the date and amount of what he receives." He further explained that he "does not keep that in memory, but writes it down daily and can even ask[] about things when Cesar was around." FRANCO said he believed "Peje" had paid the $49,260 on December 14th and would verify that fact. The ledger entry for December 14, 2011 is below.



Figure 8: Ledger entry from December 14, 2011, showing payment by "Peje" in the amount of $49,260.

79.     The drug ledger covers the period from approximately December 16, 2011, through February 8, 2012 (less than two months). Ledger entries include the notion "B" or "M." "B" is believed to be short for "blanca," the Spanish word for "white," referring to cocaine. "M" is believed to refer to "montega" or "manteca"—Spanish slang terms for heroin. A preliminary analysis of the ledger entries indicates that during the period from December 16, 2011, through

36

February 8, 2012, the SALDANA DTO distributed approximately 11.8 kilograms of cocaine and approximately 27.2 kilograms of heroin.[9]

## IV. Other Surveillance and Drug-Related Calls Involving Defendants.

### a. December 5 - 7 MONTANEZ Arranged Delivery of Approximately 4.4 Kilograms of Heroin to SALDANA DTO at 250 Kennedy Drive.

80.     Based on surveillance, intercepted calls, and ledger entries, I believe that on December 5, 2011, MONTANEZ sent a courier to 250 Kennedy Drive to deliver a sample of heroin to the SALDANA DTO. FRANCO had the sample tested on December 6, 2011. Satisfied that the narcotics were of sufficient quality, RAMIREZ-RODRIGUE and FRANCO made arrangements with MONTANEZ to purchase 4,440 grams of heroin for $83 per gram. MONTANEZ delivered the heroin the evening of December 7, 2011, and FRANCO provided an initial payment of $40,000 to MONTANEZ at that time. After discussing with RAMIREZ-RODRIGUE how much money he was owed, MONTANEZ sent a courier to pick up additional drug proceeds from the SALDANA DTO. The courier, identified as                    , met with MARTINEZ-TIBURCIO to pick up the money on December 13, 2011. The transactions are summarized below.

#### i. December 5, 2011:  MONTANEZ Sent a Sample of Heroin to the SALDANA DTO at 250 Kennedy Drive.

81.     On December 5, 2011, at approximately 4:11 p.m., MONTANEZ called RAMIREZ RODRIGUE and informed him that he had "something" but that it was expensive— "with the eight and the seven." RAMIREZ-RODRIGUE said it was too expensive. Later, MONTANEZ said that he could "lower it by two points to eight and five." RAMIREZ-RODRIGUE continued to say that it was too expensive, but asked MONTANEZ to "send a

---

[9] Analysis of the ledgers is ongoing. It is unclear whether the ledger reflects only FRANCO s distribution activity on behalf of the SALDANA DTO.

37

sample." MONTANEZ said that it came "directly" and that it "hasn't had a hand laid on" it. RAMIREZ-RODRIGUE asked for "twenty" to "try it." MONTANEZ said he would send it the next day. RAMIREZ-RODRIGUE instructed him to "bring it to Tio over there, same as always." RAMIREZ-RODRIGUE said that "Tio" would be at the location after 7:00 or 8:00 that evening.

82.    I believe that MONTANEZ proposed selling RAMIREZ-RODRIGUE heroin at a price of $87 per gram ("with the eight and the seven"); that RAMIREZ-RODRIGUE believed the price was too high; that MONTANEZ proposed lowering the price to $85 per gram ("lower it by two points to eight and five"); and that the parties agreed that MONTANEZ would send a sample to the SALDANA DTO that evening, providing it to FRANCO at 250 Kennedy Drive ("bring it to Tio over there, same as always") later that evening.

83.    MONTANEZ and RAMIREZ-RODRIGUE spoke again at approximately 7:45 p.m. regarding what I believe to be logistics for the meeting. About a minute later, RAMIREZ-RODRIGUE called FRANCO, who said he had gotten "home" about a half hour earlier. RAMIREZ-RODRIGUE told FRANCO that "Pichin," whom he described as "the one who works for "Memin"" would "pass by to leave a sample." I believe that RAMIREZ-RODRIGUE was confirming that FRANCO was present at 250 Kennedy Drive in order to receive the heroin sample that would be delivered by a courier ("Pichin") for MONTANEZ ("Memin").

84.    At approximately 7:47 p.m., RAMIREZ-RODRIGUE called MONTANEZ and instructed him to "tell Pichy [ph] to go over there." The parties continued to discuss what I believe to be a comparison of per-gram prices that MONTANEZ and others charged for heroin, MONTANEZ concluded the conversation by telling RAMIREZ-RODRIGUE to "try that one and if you don't like it, just call me."

38

85.     At approximately 7:57 p.m., MONTANEZ called RAMIREZ-RODRIGUE and instructed him to "tell the old man to go where the trash is . . . because the man is there." RAMIREZ-RODRIGUE asked, "Through the back?" MONTANEZ affirmed. I believe that MONTANEZ told RAMIREZ-RODRIGUE to tell FRANCO ("the old man") that MONTANEZ's courier, "Pichin," was arriving and that FRANCO should meet "Pichin" behind 250 Kennedy Drive, near where the trash dumpsters were located. RAMIREZ-RODRIGUE then called FRANCO to convey this information.

86.     At about 8:05 p.m., agents conducting surveillance at 250 Kennedy Drive observed an unknown Hispanic male, operating a Gray 2004 Kia Sorento, bearing Massachusetts Registration 561NC5, park in the rear parking lot of 250 Kennedy Drive in Malden. Agents observed the unidentified male exit the vehicle and make his way towards the rear entrance of 250 Kennedy Drive. A short time later, agents observed the unidentified male emerge from the same rear entrance of 250 Kennedy Drive, return to his vehicle, and depart the area. Agents followed the vehicle and observed him proceed onto Route 1 southbound before terminating surveillance. Based on these calls and observations, I believe that MONTANEZ sent a sample of heroin that MONTANEZ proposed selling to the SALDANA DTO.

### ii. December 6, 2011: FRANCO Has the Heroin Sample Tested

87.     The following afternoon, December 6, 2011, FRANCO and RAMIREZ-RODRIGUE spoke multiple times about having the heroin tested, the results of the testing, and what price they should negotiate with MONTANEZ based on the quality of the heroin.

88.     At approximately 8:08 p.m., MONTANEZ called RAMIREZ-RODRIGUE. I believe MONTANEZ proposed sending the narcotics to FRANCO between 9:00 and 11:00 the

following morning.  They talked about the quantity of narcotics MONTANEZ would bring, as well as the price, which remained "eight-three" or $83 per gram.

### iii. December 7, 2011: MONTANEZ Delivered Heroin to the SALDANA DTO at 250 Kennedy Drive .

89.    At 8:40 a.m. the next morning, December 7, 2011, RAMIREZ-RODRIGUE called FRANCO and told him "to wait there" because "Memin or Pichin—one of the two" would bring FRANCO "a little something."  FRANCO asked "what level" they agreed to.  RAMIREZ-RODRIGUE said "eight three" and added that MONTANEZ "didn't want to go lower than that."

90.    Between 9:48 a.m. and 9:50 a.m., there was a series of calls between MONTANEZ, RAMIREZ-RODRIGUE and FRANCO regarding logistics of the meeting. RAMIREZ-RODRIGUE provided MONTANEZ with Franco's telephone number, and MONTANEZ spoke to FRANCO directly, stating he would call FRANCO when he arrived, which he expected to be in 30 to 45 minutes, and instructing FRANCO to meet MONTANEZ by a door on the second floor. I believe MONTANEZ was instructing FRANCO where to meet him in the 250 Kennedy Drive apartment building.

91.    Agents had been conducting surveillance of MONTANEZ since approximately 9:20 a.m. that morning when he emerged from his residence at 87 Kiely Road in Dedham, Massachusetts. At approximately 11:05 am, the Boston Police Department conducted a motor vehicle stop of a brown Mercury Marquis bearing Massachusetts livery plate LV58206 on Columbia Road at Bodwell Street in Boston. The officer confirmed the identity of the rear passenger as MONTANEZ. No narcotics were seized. Surveillance was terminated.[10]

---

[10] At approximately 9:20 a.m., agents had observed MONTANEZ depart 87 Kiely Road in a black Ford pick-up truck bearing Massachusetts registration 631JE2. At approximately 9:53 a.m., MONTANEZ parked, exited his vehicle, and walked to the brown Mercury Marquis, which

40

92.     FRANCO and RAMIREZ-RODRIGUE spoke at 11:14 a.m. and 11:35 a.m.
regarding MONTANEZ's whereabouts, which were unknown. RAMIREZ-RODRIGUE noted
that he had tried to call MONTANEZ, but there was no answer.

93.     At 11:50 a.m., MONTANEZ called RAMIREZ-RODRIGUE and said "it won't
be possible right now." RAMIREZ-RODRIGUE said they would need to wait until that evening.
MONTANEZ agreed. RAMIREZ-RODRIGUE then called FRANCO and told him they would
"leave it for tonight" and instructed FRANCO to "leave the tickets there." I believe that
RAMIREZ-RODRIGUE informed FRANCO that MONTANEZ would deliver the narcotics that
evening ("leave it for tonight") and that FRANCO should therefore leave the money ("tickets")
at 250 Kennedy Drive in advance of the transaction.

94.     In a series of conversations later that afternoon and into the evening,
MONTANEZ and RAMIREZ-RODRIGUE discussed logistics for the meeting. At 7:29 p.m.,
MONTANEZ called FRANCO directly to make arrangements. FRANCO said he would put a
rock on the back door. MONTANEZ asked for clarification, and FRANCO described which
door to the building he was referring to. MONTANEZ, who appeared familiar with the location,
asked "if it's the one on the left side or right side when you get out of the elevator." FRANCO
replied, "When you get out, it's the one on the left side facing the parking on the back."

95.     At 8:01 p.m., MONTANEZ called FRANCO and said the door was closed.
FRANCO said he would open it. The parties spoke again three minutes later, and asked
FRANCO if he was on his way down.

96.     Although agents did not conduct surveillance of the meeting, subsequent phone
calls confirmed that FRANCO and MONTANEZ met. At approximately 8:38 p.m., RAMIREZ-

---

was parked on Columbia Road in Boston. MONTANEZ, who was carrying a backpack, entered
rear passenger door of the Mercury Marquis.

RODRIGUE called FRANCO, who reported that "Memin stopped by here just now." FRANCO further stated that he "delivered the four pesos to him."[11] I believe that FRANCO informed RAMIREZ-RODRIGUE that he met with MONTANEZ ("Memin"); that MONTANEZ provided the heroin; and that FRANCO provided MONTANEZ $40,000 ("four pesos").[12]

97.     The next day, December 8, 2011, at approximately 10:50 a.m., RAMIREZ-RODRIGUE and MONTANEZ discussed the narcotics transaction from the prior evening. RAMIREZ-RODRIGUE asked how much the "sample" was. MONTANEZ said, "[S]ix-forty each." RAMIREZ-RODRIGUE acknowledged but said that "the scale indicates six thirty-seven." MONTANEZ asked whether any of the other samples "have more" RAMIREZ-RODRIGUE said that he only checked two and they both "have six thirty-seven" RAMIREZ-RODRIGUE told MONTANEZ not to worry; he was just informing him. I believe that RAMIREZ-RODRIGUE informed MONTANEZ that he had examined two of the narcotics packages ("samples") MONTANEZ had delivered, and that they each weighed 637 grams, instead of 640 grams, as RAMIREZ-RODRIGUE had expected.

### iv. December 13, 2011: MARTINEZ-TIBURCIO Provided Payment to MONTANEZ's Courier

98.     On December 12, 2011, at approximately 5:44 p.m., MARTINEZ-TIBURCIO called RAMIREZ-RODRIGUE. During the conversation, RAMIREZ-RODRIGUE said, "I don't know if it's tomorrow or the day after, I'm going to tell you . . . so you go see Memin." MARTINEZ-TIBURCIO said it would not be a problem and said he would "figure it out with

---

[11] In addition, The above-described calls that MONTANEZ placed to FRANCO at approximately 8:01 and 8:04 p.m. were routed through a cell tower located at 252 Kennedy Drive in Malden.

[12] As described below, my belief that "four pesos" refers to $40,000 is supported in part by subsequent calls and ledger entries.

42

Memin . . . so I can bring him those coupons." I believe that at RAMIREZ-RODRIGUE's request, MARTINEZ-TIBURCIO agreed to make arrangement with MONTANEZ ("Memin") to deliver money ("coupons") owed to MONTANEZ by the SALDANA DTO.

99.     On December 13, 2011, at approximately 11:20 a.m., RAMIREZ-RODRIGUE called MONTANEZ and asked if "Chifuco" had called him. MONTANEZ affirmed. RAMIREZ-RODRIGUE asked whether MONTANEZ "had anything left of that around there? Or has the price gotten more comfortable?" MONTANEZ said he would find RAMIREZ-RODRIGUE "something of that" at a price of "eight one." RAMIREZ-RODRIGUE told MONTANEZ to "leave [it] at eight zero." MONTANEZ agreed. RAMIREZ-RODRIGUE asked MONTANEZ to send what he could "right away to I can get charged up on one round[.] [T]hat way we don't have to do multiple rounds." RAMIREZ-RODRIGUE then asked MONTANEZ to send him "at least two" but then said he was not sure how much he wanted. MONTANEZ said he would call RAMIREZ-RODRIGUE back. I believe that RAMIREZ-RODRIGUE confirmed that MONTANEZ spoke with MARTINEZ-TIBURCIO ("Chifuco"); that RAMIREZ-RODRIGUE inquired about the availability of additional heroin ("anything left of that"); that MONTANEZ proposed a transaction for $81 per gram of heroin ("eight one"); that RAMIREZ-RODRIGUE negotiated the price to $80 per gram ("eight zero"); that the parties did not establish a specific quantity of heroin before the call ended.

100.    RAMIREZ-RODRIGUE and MONTANEZ spoke again at 11:34 a.m.. RAMIREZ-RODRIGUE said "As I was telling just now, the global amount of the seven make . . . four, four eighty for eighty three." MONTANEZ affirmed. RAMIREZ-RODRIGUE continued, "It gives three, seven, one, eight hundred and forty." MONTANEZ again affirmed. RAMIREZ-RODRIGUE continued, "Minus the forty (40) that I added . . . we end up at three,

43

thirty-one, eight, forty. MONTANEZ agreed, "Yes, exactly, three, thirty one, eight."

RAMIREZ-RODRIGUE said it would "end[] up at one eight, an eighty." He continued, "Let's stay at eighty with what I am sending now." I believe that RAMIREZ-RODRIGUE and MONTANEZ discussed MONTANEZ's prior delivery of seven packages ("the global amount of the seven") containing a total of 4.480 grams of heroin ("four four eighty")[13] at $83 per gram, which resulted in a total debt of $371,840 owed by the SALDANA DTO ("It gives three, seven, one, eight hundred and forty.") Because FRANCO had previously provided $40,000 on December 7, 2011, the total debt was reduced to $331,840. This conclusion is supported by an entry in a ledger seized from 375 Broadway on February 9, 2012.



Figure 9: Undated ledger entry believed to show money flows to MONTANEZ ("Memin"). The upper left portion of the first column reflects a 4,480 gram heroin deal at $83 per gram, for a total debt of $371,840. $40,000 of which was paid on December 7, 2011 by FRANCO.

---

[13] As noted, prior calls indicate that each package should have contained 640 grams of heroin. Seven packages multiplied by 640 gram per package would yield 4,480 grams of heroin, as described by RAMIREZ-RODRIGUE.

44

101. In anticipation of the money delivery by MARTINEZ-TIBURCIO to the courier for MONTANEZ, agents established surveillance at the Lynnfield Commons apartment complex in Lynnfield, Massachusetts and at 250 Kennedy Drive, Malden, Massachusetts—both known bases of operations for the SALDANA DTO. Surveillance at these locations began at approximately 12:00 p.m.

102. At approximately 12:33 p.m., MARTINEZ-TIBURCIO called RAMIREZ-RODRIGUE. RAMIREZ-RODRIGUE asked if "Memin" (i.e., MONTANEZ) had called MARTINEZ-TIBURCIO. MARTINEZ-TIBURCIO said he missed a call from "Memin." RAMIREZ-RODRIGUE said that "Memin" was going to give "something" to MARTINEZ-TIBURCIO, and asked that MARTINEZ-TIBURCIO put "it" where "Ruby" (referring to FRANCO) was. RAMIREZ-RODRIGUE added that "Gordo" (referring to CUADRADO-ALMODOVA) had the key. MARTINEZ-TIBURCIO said that he would see CUADRADO-ALMODOVA in the "old office," which I believe refers to 250 Kennedy Drive.

103. RAMIREZ-RODRIGUE and MARTINEZ-TIBURCIO spoke again at approximately 12:35 p.m., and RAMIREZ-RODRIGUE stated, "I agreed with this man [likely referring to MONTANEZ] to meet at 2:00 in the afternoon."

104. At approximately 1:05 p.m., surveillance agents observed a red 2002 Ford Escape, bearing New Hampshire registration 322107 (registered to Landa-MARTINEZ-PEGUERO, 3 Beech St., Apt. #2, Nashua, New Hampshire; hereinafter, the "Red Ford Escape")[14] drive up the driveway of the 375 Broadway apartment complex. The Red Ford Escape was parked in the rear of Building 1. MARTINEZ-TIBURCIO exited the Red Ford

---

[14] The address to which the vehicle is registered is the same address that appears on the New Hampshire driver"s license of MARTINEZ-TIBURCIO.

Escape and proceeded to the slider doors of an apartment located to the immediate left of the rear main door of Building 1. I believe location to be apartment G-10, which MARTINEZ-TIBURCIO leased, and which is the location where agents executed a search warrant on February 9, 2012, as described above.

105.    At approximately 1:07 p.m., MARTINEZ-TIBURCIO called RAMIREZ-RODRIGUE and asked him to call "Willy" (referring to CUADRADO-ALMODOVA) so that "Willy" could open the door for MARTINEZ-TIBURCIO. At approximately 1:08 p.m., RAMIREZ-RODRIGUE called (978) 885-1177 and asked CUADRADO-ALMODOVA (a.k.a. "Willy") to open up the door for "Chifuco" (a.k.a., MARTINEZ-TIBURCIO) and asked CUADRADO-ALMODOVA, "What is that noise?" At the same time, what sounded like a blender was heard running in the background during the call.[15]

106.    At approximately 1:33 p.m., a surveillance agent observed MARTINEZ-TIBURCIO exit the apartment area and walk to the Red Ford Escape. MARTINEZ-TIBURCIO was carrying a large, weighted-down white plastic bag with red and black graphics printed on the bag (possibly a Foot Locker store bag). MARTINEZ-TIBURCIO placed the bag into the rear hatch of the Red Ford Escape and departed the area. Surveillance agents followed MARTINEZ-TIBURCIO to 250 Kennedy Drive in Malden. Agents were unable to observe MARTINEZ-TIBURCIO entering 250 Kennedy Drive, but an agent did observe the Red Ford Escape parked unoccupied on the front left side of the building.

107.    At approximately 2:35 p.m., a surveillance agent observed a gray Chevy Suburban, bearing Massachusetts registration 628EZ4 (registered to Thrifty Car Rental, 40 Lee Burbank Hgwy, Revere, Massachusetts; hereinafter, the "Gray Chevy Suburban") park in the

---

[15] Multiple blenders were seized during the execution of a search warrant at 375 Broadway, Building 1, Apartment G-10 on February 9, 2012.

46

rear right parking area of 250 Kennedy Drive. An unidentified Hispanic male exited the vehicle with a black laptop-style bag slung over his shoulder. The unidentified male appeared very nervous, looking over the parking lot, before entering 250 Kennedy Drive.

108.    At approximately 3:06 p.m., a surveillance agent observed the above-referenced unidentified male exit the right-side main door of 250 Kennedy Drive, carrying what appeared to be a Foot Locker store bag (like the one MARTINEZ-TIBURCIO had previously carried). The unidentified male placed the bag on the front passenger-side floor of the Gray Chevy Suburban and closed the door. The unidentified male then walked around the parking area looking into the windows of the surrounding vehicles. The unidentified male then entered the Gray Chevy Suburban and departed the parking area of 250 Kennedy Drive. The unidentified male drove to the neighboring building located at 248 Kennedy Drive. Agents observed the unidentified male speaking on the phone and entering 248 Kennedy Drive, carrying the Foot Locker-style bag. At approximately 3:18 p.m., the unidentified male exited 248 Kennedy Drive and entered the Gray Chevy Suburban. Agents were not able to see whether the unidentified male had any items with him. The unidentified male drove back to 250 Kennedy Drive.

109.    At approximately 3:22 p.m., an agent observed the unidentified male exit the Gray Chevy Suburban carrying the above-described black laptop-style bag and entering 250 Kennedy Drive.

110.    At approximately 3:27 p.m., MARTINEZ-TIBURCIO and RAMIREZ-RODRIGUE spoke again, and MARTINEZ-TIBURCIO said he was still at the "office" with "those people" because they had "left and had to come back." RAMIREZ-RODRIGUE asked, " [W]hy, what happened?" MARTINEZ-TIBURCIO explain that "they" had left "[s]o they could

47

give" MARTINEZ-TIBURCIO "something else." MARTINEZ-TIBURCIO said he would explain in person, adding that he was leaving soon.

111.    At approximately 3:38 p.m., a surveillance agent observed MARTINEZ-TIBURCIO's Ford Escape depart 250 Kennedy Drive. At approximately 4:00 p.m., an agent observed the Red Ford Escape arrive and park at the rear of Building 1 of 375 Broadway in Lynnfield. RAMIREZ-RODRIGUE's Mitsubishi Endeavor was also parked in the rear. MARTINEZ-TIBURCIO exited the vehicle and entered the building. MARTINEZ-TIBURCIO was carrying a plain white plastic bag.

112.    Based on the intercepted calls, ledger entries, and surveillance at 250 Kennedy Drive and 375 Broadway, I believe RAMIREZ-RODRIGUE, MONTANEZ, and MARTINEZ-TIBURCIO arranged for the delivery of narcotics to the SALDANA DTO and the delivery of money to the unidentified Hispanic male on behalf of MONTANEZ.

### b. Example of SALDANA Directing DTO Operations

113.    Since his return from the Dominican Republic in March 2012, SALDANA has been running the day-to-day operations of the DTO and has managed relationships with customers and suppliers.

114.    On numerous occasions, SALDANA has directed individuals such as CUADRADO-ALMODOVA, FRANCO, and LOPEZ-SANTOS regarding the preparation of quantities of narcotics for specific customers, and has further directed the delivery of the narcotics to those customers. An example from April 3, 2012 of surveillance and intercepted calls is described below.

48

### c. April 3, 2012: SALDANA Directed DTO Members CUADRADO-ALMODOVA, FRANCO, and LOPEZ-SANTOS Regarding Preparation and Distribution of Narcotics From 40 Church Street and Collection of Narcotics Proceeds.

115. At approximately 9:10 a.m. on April 3, SALDANA received an incoming call on Target Telephone #9 from CUADRADO-ALMODOVA. SALDANA told CUADRADO-ALMODOVA to "take seventeen" from the "whole one" (likely referring to a kilogram of narcotics) to and "add three" to the "seventeen." SALDANA stated that this would be for "Fiera." Based on surveillance and intercepted communications, "Fiera" is believed to be a narcotics customer of the SALDANA DTO. SALDANA then told CUADRADO-ALMODOVA to grab a "fifty" of the "tablets that are made," break the tablets apart, and grab "fifty more." "Tablets" is common slang for compressed narcotics, often kilogram quantities. SALDANA stated that this would be for "Pera Juan," likely referring to another Target Subject and known narcotics customer of the SALDANA DTO. SALDANA provided additional specific instructions regarding preparation of narcotics and told CUADRADO-ALMODOVA to do a good job labeling "those tablets." SALDANA also told CUADRADO-ALMODOVA that "Ruby" (i.e., FRANCO) would arrive early.

116. At approximately 9:30 a.m., a surveillance agent saw LOPEZ-SANTOS and CUADRADO-ALMODOVA arrive in a 2004 Gray Acura MDX near the rear of 40 Church Street—a drug-stash location previously used by the SALDANA DTO following the execution of the search warrant at 375 Broadway in Lynnfield. LOPEZ-SANTOS, who was driving, and CUADRADO-ALMODOVA exited the vehicle. LOPEZ-SANTOS and CUADRADO-ALMODOVA proceeded to the walkway of the rear apartments of 40 Church Street. LOPEZ-SANTOS was carrying two shopping bags.

117.    At approximately 9:39 a.m., SALDANA used Target Telephone #9 to call CUADRADO-ALMODOVA. CUADRADO-ALMODOVA asked SALDANA where the "tablets" were because they were not where "Vija" (i.e., RAMIREZ-RODRIGUE) put them. The parties discussed contacting RAMIREZ-RODRIGUE and also discussed when FRANCO would arrive.

118.    At approximately 9:59 a.m., a surveillance agent observed FRANCO arrive at the rear parking lot of 40 Church Street in a 2003 gray Acura MDX. FRANCO exited the vehicle and placed a call on a cell phone while walking to the rear apartments of 40 Church Street.

119.    At approximately 10:09 a.m., SALDANA received a call on Target Telephone #9 from CUADRADO-ALMODOVA, who reported, "two-fifty, the one hundred, and the one hundred." SALDANA instructed CUADRADO-ALMODOVA to "label them." Here, the parties were likely referring to quantities of narcotics that had been prepared for distribution. CUADRADO-ALMODOVA said he would "do a good job labeling" so they would know to whom each belonged. CUADRADO-ALMODOVA asked to whom "the other one hundred" belonged. SALDANA said he would tell CUADRADO-ALMODOVA "here" and instructed CUADRADO-ALMODOVA to come "here." SALDANA said that he and "Vija" (i.e., RAMIREZ-RODRIGUE) were at home.

120.    At approximately 10:16 a.m., SALDANA received a call on Target Telephone #9 from FRANCO, who asked whom "the 100" belonged to. SALDANA did not respond with a name, but provided FRANCO with telephone number (978) 943-8354. SALDANA instructed FRANCO to deliver "Pera Juan's" first. "100" likely refers to a quantity of narcotics (100 grams) intended for an unidentified customer referred to in later intercepted conversations as "Niño."

50

121.     At approximately 10:17 a.m., a surveillance agent saw FRANCO exit the walkway of the 40 Church Street rear apartments and leave the area in his 2003 gray Acura MDX.

122.     At approximately 11:10 a.m., SALDANA received a call on Target Telephone #9 from FRANCO, who stated that he had delivered "it" (likely referring to the narcotics he obtained from 40 Church Street) but that he did not receive any "little tickets" (common slang for money) in return.  SALDANA informed FRANCO that "they" do not pay until they "check it," likely meaning that the narcotics customer does not pay until the drugs are tested and deemed satisfactory.  FRANCO again informed SALDANA that FRANCO delivered "it."

123.     At approximately 12:12 p.m., a surveillance agent saw a 2004 gray Mitsubishi Endeavor arrive at the rear of 40 Church Street.  The vehicle parked, and SALDANA exited the front passenger side while RAMIREZ-RODRIGUE exited the driver's side.  Both entered the walkway to the rear apartments of 40 Church Street.

124.     At approximately 12:43 p.m., a surveillance agent saw LOPEZ-SANTOS, RAMIREZ-RODRIGUE and SALDANA all exit the walkway to the rear apartments of 40 Church Street.  LOPEZ-SANTOS entered 2003 gray Acura MDX, while RAMIREZ-RODRIGUE and SALDANA entered the 2004 gray Mitsubishi Endeavor.

125.     At approximately 2:49 p.m., LOPEZ-SANTOS informed SALDANA that he was on his way back.  SALDANA asked LOPEZ-SANTOS what "Pesote" gave him.  "Pesote" is a known narcotics customer of the SALDANA DTO identified as            LOPEZ-SANTOS stated, "three six hundred (360), two fifty (250), I think."  I believe this refers to payment for narcotics that the SALDANA DTO supplied to "Pesote."  LOPEZ-SANTOS stated that he paid the rent from "that."  They agreed to talk later.

51

126.     At approximately 3:37 p.m., a surveillance agent saw LOPEZ-SANTOS return to the rear of 40 Church Street in his 2003 gray Acura MDX. LOPEZ-SANTOS entered the walkway to the rear apartments.

127.     The above-described calls and surveillance observations are consistent with narcotics-trafficking activity, and moreover, are consistent with the manner in which agents have observed members of the SALDANA DTO distribute narcotics on prior occasions from known stash locations such as 250 Kennedy Drive and 375 Broadway over the course of this investigation.

### d.   June 26, 2012:   SALDANA Directed DTO Members LOPEZ-SANTOS and UM5845 and Regarding Preparation and Distribution of Narcotics from 81 Phillips Street in Lawrence and the Collection of Narcotics Proceeds.

128.     On June 26, 2012, at approximately 12:26 p.m., SALDANA placed an outgoing call to (978) 390-5845 and spoke to UM5845, an unidentified member of the SALDANA DTO. SALDANA asked UM5845 if he was on his way to see "Pinguino." UM5845 affirmed and said he on his way there now because "the girl" was "delayed a bit." SALDANA asked why there was a delay. UM5845 replied that the girl was "counting the chelitos" because they did not have them counted. UM5845 said, "It seems they had it scattered." SALDANA acknowledged. UM5845 asked for the name of the street where "Pinguino" was located and asked if it was near where SALDANA lives. SALDANA confirmed that is was "[a]round where I live" but said he did not know the street name. I believe that UM5845 informed SALDANA that he was on his way to pick up money ("chelitos") from "Pinguino," and that he was delayed because an unidentified female who worked with "Pinguino" had not yet counted the money for the SALDANA DTO.

52

129. At approximately 12:31 p.m., SALDANA placed a call from Target Telephone #12 to (978) 397-8716 and spoke to "Pinguino." SALDANA said, "He is there. And you are not opening." SALDANA told "Pinguino" that UM5845 was "in a taxi." I believe that SALDANA called "Pinguino" to inform him that UM5845 had arrived at 12 Bourque Street in a taxi, and that "Pinguino" should let him inside the residence.

130. At approximately 12:45 p.m., agents observed an unidentified Hispanic male in front of 12 Bourque Street in Lawrence. At approximately 12:52 p.m., the individual entered a Liberty Taxi and departed. Agents followed the taxi to 81 Phillips Street, where the unidentified male (believed to be UM5845) exited the taxi and walked towards the rear side door of 81 Phillips Street.

131. At approximately 1:30 p.m., MONTANEZ called SALDANA and said, "Listen, at the sister-in-law's or the woman's?" SALDANA responded, "At the sister-in-laws." The conversation ended. I believe that MONTANEZ was calling to confirm a meeting location, and based on information gathered in this investigation, that "the sister-in-law's" refers to 81 Phillips Street, and "the woman's" refers to SALDANA's residence at 10 Diamond Street, Apartment 19 in Lawrence.

132. At approximately 1:40 p.m., agents observed LOPEZ-SANTOS arrive at 81 Philips Street in a silver Acura MDX. He parked in the driveway and entered the building via the rear side door. He departed about seven minutes later in the silver Acura MDX. Shortly thereafter, LOPEZ-SANTOS called SALDANA and reported that he had collected "2,000 bucks," which he left "at Cuñi's with Moreno." Based on information gathered in this investigation thus far, I believe that "Cuñi" is an abbreviation of the Spanish word "cuñada" which means "sister-in-law." Further, I believe that "Moreno" refers to UM5845. As noted,

SALDANA DTO members have referred to 81 Phillips Street as "the sister-in-law's place." Therefore, I believe that LOPEZ-SANTOS informed SALDANA that he had collected $2,000 ("2,000 bucks") from an unidentified individual, and that he left the money at 81 Phillips Street with UM5845.

133. At approximately 2:24 p.m., LOPEZ-SANTOS returned to 81 Philips Street and entered the residence.

134. At approximately 2:01 p.m., SALDANA placed an outgoing call from Target Telephone #12 to (978) 390-5845 and spoke again to UM5845. SALDANA instructed UM5845 to "take out for me fifty pesos for         And you are going to go with this guy and bring it." UM5845 asked, "With William?" SALDANA affirmed, and continued to instruct UM5845, "So you take out of the one hundred that are left there . . . of the one hundred original ones that are left there. Take out fifty." I believe that SALDANA instructed UM5845, who was at 81 Phillips Street, to prepare 50 grams of narcotics ("fifty pesos") for         I         and that UM5845 was to deliver the narcotics with LOPEZ-SANTOS ("William").

135. At approximately 2:31 p.m., SALDANA called         and informed him that "the guy already left for over there."         said, "But I was calling for you to send me the decoration. That's why I was calling you, man." SALDANA affirmed and said, "Let me call him."         specified his request: "Fifty pesos of decoration." I believe SALDANA informed         that his courier had already left to deliver the 50 grams of narcotics that         requested and that         further requested 50 grams of cutting agent ("decoration").

136. A minute later, SALDANA called UM5845 and asked whether "William" arrived. UM5845 affirmed, and added, "We are taking out a little money he told me has to be taken to . . . " SALDANA interrupted, stating, "Yes, uh, take it out of the five-something that came in

54

yesterday and to complete it with the other two also." SALDANA told UM5845 to "send fifty pesos of cortina to █████ also." UM5845 affirmed. SALDANA stated, "The fifty, plus fifty pesos of cortina." I believe that SALDANA inquired where LOPEZ-SANTOS ("William") was; that, consistent with surveillance observations, UM5845 reported that LOPEZ-SANTOS had arrived at 81 Phillips Street and that they were gathering money for an unstated purpose; that SALDANA instructed UM5845 to prepare 50 grams of cutting agent ("50 pesos of cortina") along with the 50 grams of narcotics for █████ █████

137. At approximately 2:26 p.m., agents observed MARTINEZ-TIBURCIO arrive at 81 Phillips Street in a red Ford Escape and park in front of the house. MARTINEZ-TIBURCIO exited the vehicle and walked down the driveway towards the rear side entrance of 81 Phillips Street. At approximately 2:36 p.m., agents observed a gray Mercury Montego park in the driveway of 81 Phillips Street. An unidentified Hispanic male exited the vehicle and opened the trunk. Agents did not see whether he removed any items from the trunk. They observed him walk towards the rear door of 81 Phillips Street.

138. At approximately 2:39 p.m., SALDANA called LOPEZ-SANTOS and asked him if he was "already out on the street." LOPEZ-SANTOS said he was "waiting for this guy." SALDANA then transferred to an incoming call from MONTANEZ, who said, "Open the door, man. The man's outside. SALDANA affirmed. MONTANEZ responded, "He's with Chifuco outside." I believe that MONTANEZ called SALDANA to inform him that MONTANEZ's associate had arrived at 81 Phillips Street and was waiting outside with MARTINEZ-TIBURCIO ("Chifuco"). This is consistent with surveillance observations describe above.

139. At approximately 2:40 p.m., agents observed MARTINEZ-TIBURCIO walk down the driveway of 81 Phillips Street to his red Ford Escape carrying a brown package. About

three minutes later, LOPEZ-SANTOS and UM5845 exited 81 Phillips Street and departed in the silver Acura MDX.

140.    At approximately 3:05 p.m., the unidentified male believed to be an associate of MONTANEZ departed in the Mercury Montego. Agents followed the vehicle to Interstate 93 south, where surveillance was terminated.

## V.    Use of 81 Phillips Street, First Floor Rear Apartment, as Drug Stash Location and Base of Operations

141.    Based on my training, experience, and involvement in this investigation, I believe that the activity described in paragraphs 128 - 140 is consistent with the use of 81 Phillips Street, First Floor Rear Apartment, as a drug and money stash location. This type of activity, along with corresponding intercepted calls relating to drug deliveries, drug processing, and money collection and deliveries, was observed at 81 Phillips Street during several days of physical surveillance. During that time, members of the SALDANA DTO, along with individuals believed to be drug suppliers and drug customers accessed only the rear first floor apartment of 81 Phillips Street.

142.    For example, on June 20, 2012, SALDANA was intercepted making what I believe to be arrangements with          who is a target of a separate but related DEA wiretap investigation, to supply          with heroin. At 10:37 a.m., SALDANA placed a call from Target Telephone #12 to (978) 397-4793 and spoke to          . During the call, SALDANA told          to send the guy to "Phili" (i.e., Phillips Street) where he went to get the "tickets" (the drug money), not where he "went to bring." At 11:23 a.m., SALDANA called          back and told          to send "his guy there to the 81" (i.e., 81 Phillips Street) and further told          to call him once "the guy" arrived there so that they could open the door and to go in the back. A short time later, at 11:24 p.m., SALDANA called UM5845 and told him that          (i.e.,

56

was going to call when "his guy was outside" and that "he only wants six hundred pesos" (believed to be 600 grams of heroin).

143. On June 20, 2012, at 10:30 a.m., surveillance was established at 81 Phillips Street. At 11:39 a.m., a surveillance agent saw a black Mercedes bearing Massachusetts license plate 258NT5 arrive on Phillips Street and park in front of 81 Phillips Street. Shortly thereafter, an agent observed a Hispanic male wearing a white T-shirt, believed to be ███ ███ a courier for ███ exit the vehicle and walk to the left side of 81 Phillips Street towards the rear apartment. At 11:53 a.m., an agent observed LOPEZ-SANTOS arrive in his silver Acura MDX. LOPEZ-SANTOS retrieved two multi-colored bags, which appeared to have box shaped contents, and then walked around to the left side of 81 Phillips Street towards the rear apartment. At approximately 1:15 p.m., an agent observed the male with the white T-shirt believed to be ███ ███ exit the area of 81 Phillips Street carrying what appeared to be one of the same multi-colored bags that LOPEZ-SANTOS had brought. ███ entered the black Mercedes and departed the area.

144. Based on the intercepted calls and surveillance, I believe this is one of several instances in which LOPEZ-SANTOS or other DTO members brought narcotics to the first floor rear apartment of 81 Phillips Street in order to conduct a narcotics transaction set up by SALDANA.

145. The pattern of activity at 81 Phillips Street is consistent with what agents observed at other known or suspected drug stash locations used by the SALDANA DTO, including 250 Kennedy Drive and 375 Broadway. Therefore, I believe there is probable cause that agents will find substantial evidence of drug trafficking in the rear first floor apartment of 81 Phillips Street.

## VI.    Target Locations

### a.  81 Phillips Street, First Floor Rear Apartment, Lawrence, Massachusetts (Target Location #1)

#### Description of Target Location #1

146.    Target Location #1 is the rear apartment on the first floor of 81 Phillips Street, Lawrence, Massachusetts, and is part two-story, multi-family dwelling with off-white siding and white trim. As viewed from Phillips Street, the front of the building containing Target Location #1 has two entrances, one clearly marked "81" in white numbering (on a black background) above the doorway, the other clearly marked "79" in white numbering (on a black background) above the doorway. To the left of the doorway marked "81" is a mailbox labeled "81 Front" along with three names. There is a driveway along the left side of the building containing Target Location #1 that leads to a side entrance, covered by an awning, in the rear portion of 81 Phillips Street.[16] This rear side entrance is accessed by a short wooden staircase and is used to access Target Location #1. The rear apartment only constitutes Target Location #1. Three recent photographs depicting the front of 81 Phillips Street and the side entrance used to access Target Location #1 are attached to the warrant application and warrant

#### Link to Criminal Activity

147.    Examples of the types of criminal activity occurring at this Target Location are set forth above at paragraphs 128-145 of this Affidavit. The criminal activities described are representative of what agents have observed through physical surveillance on multiple other occasions. In addition, intercepted calls indicate that such activities are occurring on an ongoing, almost daily basis at that location. Precise location information obtained for cellular telephones used by certain SALDANA DTO members indicate that Target Location #1 continues to be

---

[16]  Utility records confirm that 81 Phillips Street contains a rear apartment.

accessed on a regular basis by LOPEZ-SANTOS, UM5845, and UM8165. Agents observed LOPEZ-SANTOS and UM5845 at Target Location #1 on July 6, 2011.

### b. **10 Diamond Street, Apartment #19, Lawrence, Massachusetts (Target Location #2)**

#### Description of Target Location #2

148.    Target Location #2 is Apartment 19 at 10 Diamond Street, Lawrence, Massachusetts, which is part of a multi-unit apartment building that, in turn, is part of a multi-building complex called "Hampton on Beacon Street." The apartment complex consists of approximately nine buildings on Beacon Street and Diamond Street. 10 Diamond Street, which contains Target Location #2, is a three-story building containing multiple apartments. Portions of the exterior of 10 Diamond Street are brick, and portions are white clapboard in appearance. The building can be accessed through any of four entrances—a rear entrance on Diamond Street, a main entrance on the opposite side of the building from Diamond Street, and two side entrances. The main entrance is located on the opposite side of the building from Diamond Street, on the interior of the apartment complex. A brown sign with the number "10" in white hangs from the exterior of the building, several yards to the right of the main entrance and several yards above ground level. Target Location #2 is located on the middle floor of the three floors. Upon entering from the building's main entrance, Target Location #2 is located partway down a hallway to the left of a short central staircase. The door to Target Location #2 is clearly labeled with the number "19." A recent photograph of the exterior of building containing Target Location #2, and a recent photograph of the interior stairway described above, are attached to the warrant application and warrant.

59

## Link to Criminal Activity

149.  Target Location #2 is the primary residence of SALDANA, the leader of the DTO. During multiple intercepted telephone calls, SALDANA provided directions DTO members, narcotics suppliers, and other criminal associates directions to building number 10 of the apartment complex, which he has alternatively referred to as the "bricks" and the "Hamptons" and his "girlfriend's." On two occasions, while speaking with narcotics supplier LEBRON-RIVERA regarding meetings, he specifically referred to Apartment 19, instructing LEBRON-RIVERA to "ring 19" when LEBRON-RIVERA arrived. Agents have obtained cell tower data for calls over Target Telephone #12, used by SALDANA. The vast majority of calls made late in the evening (after 9:00 p.m.) and in the morning (before 10:00 a.m.) were routed through a cell tower located at 20 Glenn Street in Lawrence, Massachusetts, which is .4 miles from Target Location #2, and is the closest cell tower to Target Location #2. In addition, in a call with unidentified DTO member UM5845, SALDANA described the residence of criminal associate known as "Pinguino" as "[a]round where I live." The investigation has established that "Pinguino" resides at 12 Bourque Street in Lawrence, which is approximately .4 miles away.

150.  On multiple occasions, and as recently as July 5, 2011, agents observed SALDANA exiting 10 Diamond Street. Agents have also observed LEBRON-RIVERA enter 10 Diamond Street on June 18 and June 19, 2012, to meet with SALDANA, based on intercepted calls. In addition, agents have observed LOPEZ-SANTOS, and other individuals believed to be a criminal associates of SALDANA based on intercepted calls, travel to 10 Diamond Street to meet SALDANA.

151.  Utilities for Target Location #2 are in the name of Elizabeth Rodriguez, believed to be the girlfriend of SALDANA. The telephone number that Rodriguez provided to the utility

60

company was in contact with a telephone believed to be have been used by SALDANA 442 times between March 25 and April 17, 2011. The names "Rodriguez" and "Herrera" appear on the mailbox for apartment 19 at 10 Diamond Street.

### c. 87 Kiely Road, Dedham, Massachusetts (Target Location #3)

#### Description of Target Location #3

152. Target Location #3, 87 Kiely Road, Dedham, Massachusetts, is a single two-story unit of a residential duplex building that includes 87 Kiely Road and 89 Kiely Road. The building's exterior facing Kiely road is beige. The building has two front entrances facing Kiely Road, one for 89 Kiely Road on the left, and one for Target Location #3 on the right. The front door to Target Location #3 is marked with black numeral "87" below the front door, which is located one step above a platform at the top of several steps leading to the front yard. There is an outer white storm door, and a red exterior door leading to Target Location #3. A recent photograph of Target Location #3 and a photograph of Target Location #3 obtained from public records are attached to the warrant application and warrant.

#### Link to Criminal Activity

153. 87 Kiely Road is the primary residence of MONTANEZ, a narcotics supplier to the SALDANA DTO. In December 2011, when agents were intercepting wire communications over a telephone used by MONTANEZ (Target Telephone #7), precise location information obtained for that telephone, coupled with intercepted communications over that telephone, established that he was present at the Target Location overnight. In addition, on at least two occasions in December 2011, surveillance agents observed MONTANEZ emerge from the front door to the Target Location in the morning. As noted above, on one of those occasions, December 7, 2011, I believe MONTANEZ was on his way to deliver heroin to the SALDANA

DTO at 250 Kennedy Drive. Agents observed MONTANEZ emerging from Target Location #3 as recently as approximately 12:00 p.m. on June 19, 2012. More recently, precise location information obtained for a different telephone that MONTANEZ is currently using (and over which he has been intercepted conducting narcotics-trafficking activity with SALDANA) has established that he continues to stay overnight at 87 Kiely Road. Location information has been obtained for the period July 5, 2012 to the present. I therefore believe that MONTANEZ continues to reside at the Target Location. MONTANEZ recently discussed with SALDANA what I believe to be money owed by the SALDANA DTO to MONTANEZ for narcotics.

## VII. Drug Traffickers' Use of Residences and Stash Locations Generally

154. It has been my experience that drug traffickers use "stash locations" for their drugs, in order to avoid keeping large quantities of the drugs in their residences. Stash locations also provide some measure of security for drug traffickers, who are concerned about being robbed. Stash locations provide privacy so that traffickers can break down and package the drugs, often with assistance from associates, at a location away from their homes and families. A stash location also provides some anonymity for the delivery of bulk drugs; in this way, a drug trafficker can receive a shipment of drugs without letting the courier (or other members of the supply organization) know where he or she lives.

155. Based upon my training and experience, as well as the training and experience of other law enforcement agents I have worked with, I am also aware that it is generally a common practice for traffickers to conceal at their stash locations large sums of money, either the proceeds from drug sales or monies to be used to purchase controlled substances.

156. Based upon my training and experience, as well as the training and experience of other law enforcement agents I have worked with, I am aware that it is generally a common

practice for drug traffickers to store drug-related paraphernalia in their residences for longer periods of time than they keep drugs in their residences. Further, it is generally a common practice for drug traffickers to maintain in their residences and in stash locations records relating to their drug trafficking activities. Because drug traffickers in many instances will "front" (that is, sell on consignment) controlled substances to their clients, or alternatively, will be "fronted" controlled substances from their suppliers, such record-keeping is necessary to keep track of amounts paid and owed, and such records will also be maintained close at hand so as to readily ascertain current balances. Often drug traffickers keep "pay and owe" records to show balances due for drugs sold in the past ("pay") and for payments expected ("owe") as to the trafficker's suppliers and the trafficker's dealers. Additionally, drug traffickers must maintain telephone and address listings of clients and suppliers and keep them immediately available in order to efficiently conduct their drug trafficking business. I am also aware that drug traffickers often maintain such documents related to their drug trafficking activities at their residences for an extended period of time, regardless of whether they are physically in possession of drugs on the premises.

157. Based upon my training and experience, as well as the training and experience of other law enforcement agents I have worked with, I am also aware that it is generally a common practice for traffickers to conceal at their residences large sums of money, either the proceeds from drug sales or monies to be used to purchase controlled substances. In this connection, drug traffickers typically make use of wire transfers, cashier's checks, and money orders to pay for controlled substances. Evidence of such financial transactions and records relating to income and expenditures of money and wealth in connection with drug trafficking would also typically be maintained in residences.

158. In addition, during the course of such residential searches, agents have also found items of personal property that tend to identify the person(s) in residence, occupancy, control, or ownership of the subject premises. Such identification evidence is typical of the articles people commonly maintain in their residences, such as canceled mail, deeds, leases, rental agreements, photographs, personal telephone books, diaries, utility and telephone bills, statements, identification documents, and keys. See, e.g., United States v. Feliz, 182 F.3d 82, 87-88 (1st Cir. 1999).[17]

159. Based upon my training and experience, as well as the training and experience of other law enforcement agents I have worked with, I am also aware that drug traffickers generally try to hide cash and sensitive documents related to their drug trafficking activities in safes or other containers so that other individuals who are at their residence do not discover these materials. Typically, drug traffickers also possess firearms and other dangerous weapons to protect their profits, supply of drugs, and persons from others who might attempt to forcibly take the traffickers' profits and/or supply of drugs.

160. I have participated in the execution of numerous search warrants at the residences and stash locations of drug traffickers who are similar to targets of this investigation. In a substantial number of searches executed in connection with the drug investigations in which they have been involved, in addition to actual controlled substances, the following kinds of drug-related evidence have typically been recovered:

---

[17] In Feliz, the First Circuit made it clear that, in the drug trafficking context, evidence of drug transactions can be expected to be found in a drug trafficker's residence for months after evidence of the last drug transaction. 182 F.3d 82, 87 (1st Cir. 1999) ("[C]ourts have upheld determinations of probable cause in trafficking cases involving [three months long] or even longer periods.") (citing United States v. Greany, 929 F.2d 523, 525 (9th Cir.1991) (two year-old information relating to marijuana operation not stale)). As the First Circuit has explained, "By its very nature, drug trafficking, if unchecked, is apt to persist over relatively long periods of time." United States v. Nocella, 849 F.2d 33, 40 (1st Cir. 1988).

a. illicit narcotics, including trace amounts;

b. documentary or other evidence manifesting dominion and control over the subject premises (such as utility and telephone bills, statements, identification documents, and keys);

c. paraphernalia for packaging, processing, diluting, weighing, and distributing controlled substances, such as scales, funnels, sifters, grinders, glass panes and mirrors, razor blades, plastic bags, heat-sealing devices, and presses;

d. books, records, receipts, notes, ledgers, and other papers relating to the distribution of controlled substances;

e. personal books and papers reflecting names, addresses, telephone numbers, and other contact or identification data relating to the distribution of controlled substances;

f. electronic equipment such as computers, currency counting machines, and telephone answering machines to generate, transfer, count, record and or store the information described above;

g. cash, currency, and records relating to controlled substances income and expenditures of money and wealth, such as money orders, wire transfers, cashier's checks and receipts, bank statements, passbooks, checkbooks, and check registers, as well as precious metals such as gold and silver, and precious gems such as diamonds;

h. documents indicating travel in interstate and foreign commerce such as travel itineraries, plane tickets, boarding passes, motel and hotel receipts, passports and visas, credit card receipts, and telephone bills;

i. cellular telephones, PDAs, tablet computers, and other wireless devices.

161. Based upon the foregoing, and based upon my training and experience, I submit that there is probable cause to believe that the each of the above-described target locations presently contains the items that constitute evidence of the commission of criminal offenses, contraband, the fruits of crime, things otherwise criminally possessed, and property designed or intended for use or which is or has been used as the means of committing a criminal offense, specifically, a violation of 21 U.S.C. § 846. The specific items that there is probable cause to

believe will be found at each target location are set forth in Attachment B to the respective search warrant application and warrant for each target location.

## CONCLUSION

162.    Based on the information set forth above, I believe probable cause exists to conclude that SALDANA, RAMIREZ-RODRIGUE, FRANCO, CUADRADO-ALMODOVA, MARTINEZ-TIBURCIO, LOPEZ-SANTOS, MONTANEZ, and LEBRON-RIVERA have conspired and continue to conspire to possess with intent to distribute, and to distribute, cocaine and heroin, in violation of 21 U.S.C. § 846, and that evidence of said criminal offense, as set forth in Attachment B each of the respective search warrant applications for the target locations, will be found inside each target location.

163.    I, James Picardi, having signed this Affidavit under oath as to all assertions and allegations contained herein, state that its contents are true and correct to the best of my knowledge, information, and belief.

James Picardi
Task Force Officer, DEA

SUBSCRIBED and SWORN to before me
this ___6___ day of July, 2012.

Honorable Judith G. Dein
United States Magistrate Judge
District of Massachusetts

66